# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

**WILLIAM  MITCHELL**                                                          **PETITIONER**

**VS.**                                            **CIVIL ACTION NO. 1:04CV865(LG)**

**CHRISTOPHER EPPS, Commissioner,
Mississippi Department of Corrections
MICHAEL A. WILSON, Superintendent,
Mississippi State Penitentiary, and JIM
HOOD, Attorney General of the State
of Mississippi**                                                          **RESPONDENTS**

═══════════════════════════════════════════════════════════════

## MEMORANDUM OPINION AND ORDER DENYING PETITION
## FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254

William Gerald Mitchell was convicted of the capital murder of Patty Milliken and sentenced to death in the Circuit Court of Harrison County, Mississippi.  He unsuccessfully appealed that conviction and sentence. *Mitchell v. State*, 792 So. 2d 192 (Miss. 2001).  Later, he petitioned for post conviction relief, but that petition was denied.  *Mitchell v. State*, 886 So. 2d 704 (Miss. 2004).  He has filed a Petition for Writ of Habeas Corpus in this Court, alleging eleven grounds for relief.

## FACTS

The Mississippi Supreme Court set out the facts upon which Mitchell was convicted and sentenced, and its summary of the facts is as follows:

> The last time that Patty Milliken was seen alive was at the conclusion of her shift at 8:00 p.m., November 21, 1995, at the Majik Mart on Popps Ferry Road in Biloxi, Mississippi.  She told her co-worker, James Leland Hartley, that she was going outside to smoke and talk to William Gerald Mitchell and that she would return shortly.  Before following Mitchell outside, she telephoned her son, telling him she would be home in approximately fifteen minutes.  She also left her keys in the safe to initiate a 10-minute time-released unlock and her purse and other

personal items on the counter. Patty Milliken's body was found the following morning under a bridge. She had been beaten, strangled, sexually assaulted, crushed by being driven over, and mutilated.

The record shows that on November 21, 1995, Hartley saw Mitchell enter the store three separate times to visit Milliken while she was working her shift. Hartley overheard Milliken refer to Mitchell by the name of "Jerry." At the end of Millken's shift that evening, around 8:00 p.m., Milliken and Hartley realized that they had forgotten to document the amount of cash they had placed in the safe that night. Milliken opened the safe and telephoned her son that she would be home in fifteen minutes. At approximately 8:05 p.m. Milliken decided to walk out of the store with Mitchell and told Hartley that "she'd be outside smoking a cigarette if [Hartley] needed her and that she'd be right back."

Milliken left her keys in the lock on the safe, cigarettes and lighter on one counter, and her purse on the other counter. Hartley testified that it was odd for Milliken to go outside to smoke because employees were authorized to smoke inside the store. Ten minutes after Milliken had gone outside, Hartley walked outside to ask her a question, but she was not there. Her belongings were still inside the store, and her car remained in the parking lot. Hartley telephoned Milliken's home and learned that she had not been in contact with her family. When Milliken had still not returned by 10:00 p.m., Hartley telephoned the police.

When the police arrived, Hartley gave them Milliken's purse and showed them where she had written Jerry's phone number. The police cross-referenced the telephone number to a physical address, and proceeded to 323 Croesus Street. The police arrived at the residence at approximately midnight.

Officers Matory and Doucet went to the front door, and Officer McKaig "was on the right side of the house approaching the rear." McKaig saw Mitchell, and Mitchell asked, "Who's that?" McKaig identified himself as a police officer and explained that he wanted to speak to him. Mitchell ran, and a pursuit on foot followed.

Captain Anderson responded to assist with the foot pursuit. Captain Patterson, arriving to assist with the foot pursuit, spoke with Booker Gatlin, Mitchell's grandfather and owner of the residence on Croesus Street. Gatlin indicated that "Jerry" was William Gerald Mitchell, and that he drove a blue Grand Am.

When the foot pursuit proved unsuccessful, the Biloxi Police Department issued a be-on-the-lookout ("BOLO") for Mitchell and his vehicle. Shortly thereafter, an officer spotted Mitchell getting gas at a Shell station located on U.S. Highway 90. When Mitchell noticed the police car, he threw down the gas nozzle he was using and sped away in his vehicle. Patrolman Sonnier took part in the pursuit of Mitchell. That evening he had a television camera crew riding with him, and they were able to film most of the pursuit. Sonnier testified that Mitchell was the driver of the vehicle and that Curtis Pearson was his passenger. The high-speed chase ended in Mitchell being arrested for various traffic violations. Mitchell's passenger, Pearson, testified that, during the chase, Mitchell stated 2-3 times that he "got that bitch."

Officer Heard of the Biloxi Police Department discovered the mutilated, almost naked body of Patty Milliken under the Popps Ferry Bridge at 7:14 a.m. the following morning. Officer Robert Burriss arrived at the scene at approximately 7:30 a.m., and worked the scene until 2:00 p.m. Burriss testified that he found Milliken's body on its back. She had part of a shirt sleeve around her right arm and part of her bra around her left arm, with only a pair of white socks clothing her body. Her body was bruised and scraped, and her head was "burst open" with the brains "spilling out of the skull, scattered about on the yard, and there [sic] was also some of the brain matter stuck on her back."

There were "numerous" tire tracks "back and forth all over that area"; tracks that were similar to the ones found on Milliken's body. Testing would ultimately show that the tire casts from the area matched three of the four tires on Mitchell's car with regard to tread design, size and "overall width."

Later that day, pursuant to a search warrant, Burriss also collected evidence from Mitchell's car. Burriss made a diagram of the car indicating where he found "various pieces of blood and hair on the automobile." Burriss found hair and blood on the passengers' door; blood underneath the fender and body of the car, as well as on the catalytic converter; and blood spatters in three of the wheel wells. Milliken's broken lower dentures were also found in Mitchell's car.

After Mitchell's arrest for traffic violations, he was taken to the Biloxi Police Department. Mitchell was initially interviewed by Sergeant Torbert and Investigator Thompson. Later, Officers Newman and Peterson interviewed Mitchell at 1:07 p.m. on November 22, 1995, the same day Milliken's body was found. At the time of this second interview,

Mitchell had not been arrested or charged with murder, but was in custody for the traffic violations. Mitchell said that he was the only one to use his vehicle that night. Mitchell claimed that Milliken was alive when he left her, though he did admit that he had hit her hard enough in the nose that "blood just flew everywhere." A redacted version of Mitchell's second interview was admitted during the trial. The tape was edited and redacted at the point before Mitchell made any statement that he killed or was responsible for the death of Milliken.[1]

After Mitchell's second interview, Mitchell was booked on the charge of murder and transported to the Harrison County Jail. Prior to his transfer, a suspect rape kit was performed on Mitchell at the Biloxi Regional Medical Center. Later, search warrants were secured and executed on Mitchell, Mitchell's car, and Mitchell's residence at 323 Croesus Street in Biloxi.

---

[1]The state court record provided to this Court omitted, as is customary in habeas cases, the exhibits presented at trial. One of those exhibits was a videotaped confession, which, while not necessary to resolve the claims made in this case, contains Mitchell's explanation of how the crime occurred. That confession was not transcribed, and its contents do not appear in the material provided to this Court. However, prior to his trial, Mitchell was examined by Dr. Henry Maggio to determine his competence. After being advised that any statement he made would be provided to the prosecution, and after consultation with his counsel, he gave the following statement, which likely agrees in principal part with his confession:

> [H]e met a female at a store and went to see her as she was to get off work at about 8 o'clock. They had been friends, he states, 3-4 months and they left work in his car and they were parked by a local lover's lane. They were outside of the car talking and got into an argument and she slapped him and he automatically hit her with his fist and states that there's a period of time that he can't really account for. He realized that he had hit her with his fist; that he was out on parole, and panic sets in. He got in the car, turned on the key and ran over her. He thought it was in reverse but the car ran forward and ran over her. It was in a rather tight area facing under a bridge in a spot where only one car could go through at a time. He ran over her and realized that she was under the car. He pulled back and forward about 5 times, got out and she was still living. He got out and he was looking at her; the lights were on and she was still breathing when he left. He did not try to clean up or change anything.

Dr. Paul McGarry performed the autopsy on Milliken's body. According to McGarry, Milliken was strangled, beaten, sexually assaulted, and repeatedly run over by a vehicle. McGarry stated that the damage to Milliken's larynx cartilages and hemorrhagic airway proved that she had been strangled. There were also semicircular marks from her attacker's fingernails on her neck. She was beaten to the point that her lower denture was broken and expelled. Her face was swollen and purple which "would evidence that hard blows had been delivered to the head." Analysis of the genital area displayed "the kind of injuries that are produced by stretching and tearing of the delicate lining of the vagina" which McGarry "interpreted as forceful penetration enough to damage the tissue and tear and rub off surfaces of the tissue, to stretch the opening. The anus was even more so damaged." McGarry confirmed that Milliken's sexual injuries occurred while she was still alive.

McGarry also testified to finding five tire tracks across the victim's body. According to McGarry, Milliken apparently lived long enough to experience the crushing injuries that ruptured her kidney, liver and spleen; broke almost every rib; broke her spine; broke her collarbone; and, tore open her lungs and heart vessels. Milliken was killed when her "brain [was] blown out by crushing and squashed out." The brain was expelled up to four feet from an opening at the top of her head measuring eight inches in diameter.

At the time of Milliken's savage murder, Mitchell had been paroled for approximately eleven months from a sentence of life in prison for murder.

*Mitchell v. State*, 792 So. 2d at196-98.

Mitchell has raised eleven grounds for habeas relief in this Court. After careful review of the record and the state court opinions in this case, as well as consideration of the applicable law, the Court concludes that Mitchell is not entitled to habeas relief, and his Petition should be dismissed.

## STANDARD OF REVIEW

The standard of review that a federal court applies to a state court decision under habeas review is contained in 28 U.S.C. § 2254. It provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under this provision, where the state court adjudicates the petitioner's claim on the merits, this court reviews questions of fact under § 2254(d)(2), while questions of law or mixed questions of law and fact are reviewed under § 2254(d)(1). Factual findings are presumed to be correct, and the reviewing court defers to the state court's decision regarding factual determinations unless the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000); 28 U.S.C. § 2254(d)(2).[2] The court independently reviews questions of law and mixed questions of law and fact to determine whether the state court's decision thereon was either "contrary to" or an "unreasonable application of" federal law. *Williams v. Taylor*, 529

---

[2]The Supreme Court has expressly reserved ruling on whether the provisions of § 2254(e)(1), which accord a presumption of correctness to state court findings that can only be overcome by clear and convincing evidence, applies to all fact findings, or only those extrinsic to the state court record. *Wood v. Allen*, ___ U.S. ___, 130 S. Ct. 841, 849 (2010).

U.S. 362 (2000); *Williams v. Puckett*, 283 F.3d 272 (5th Cir.2002); *Hill v. Johnson*, 210 F.3d at 485.

For purposes of this analysis, "federal law" is determined by the Supreme Court of the United States, and this Court must determine whether the state court's decision was "contrary to" or "an unreasonable application of" that established federal law. *Williams*, 529 U.S. at 378, 406; § 2254(d)(1). Clearly established federal law is that which exists at the time of the state court conviction. Compare *id.* at 412 (stating that the law must exist when the state court decision is rendered) and *id.* at 390 (stating that the law must exist when the state court decision is final); *Smith v. Spisak*, ___ U.S. ___, 130 S. Ct. 676, 681 (2010) (recognizing these conflicting statements, but following the Court of Appeals' use of the date that the decision was rendered). A state court's adjudication of a claim is *contrary to* clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases or if it decides a case differently than [the Supreme Court has] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court's application of the correct legal precedent to the particular facts of a petitioner's case will be an *unreasonable application* of the law if it identifies the correct federal law but unreasonably applies it to the facts, unreasonably extends the correct legal principle to a new context where it should not apply, or unreasonably refuses to extend the principle to a new context where it should apply. 529 U.S. at 406. The term "unreasonable," was distinguished in *Williams* from "erroneous" or "incorrect"; thus,

a state court's "incorrect" application of the law may be permitted to stand if it is, nonetheless, "reasonable."

<u>ANALYSIS</u>

**A.    Petitioner was denied his right to present a defense in violation of the Sixth Amendment to the United States Constitution.**

This argument is directed toward the indictment under which the State tried this case, which was amended immediately prior to trial.  Mitchell was originally indicted on July 25, 1996, in Case Number B2402-96-0263.  According to this indictment, Mitchell:

> did **wilfully, unlawfully, with or without deliberate design**, then and there feloniously kill Patty Milliken, a human being while the said William Gerald Mitchell was under a sentence of Life imprisonment having been convicted in the Second Judicial District of Harrison County, Mississippi, on June 24, 1975, in cause number: 900, of the felony of Murder, and, on June 24, 1975, in said Court, was sentenced to a term of Life in the custody of the Mississippi Department of Corrections,
>
> contrary to and in violation of Section 97-3-19(2)(e), Miss. Code of 1972, as amended, and against the peace and dignity of the State of Mississippi (emphasis added).

Additionally, that indictment charged Mitchell with having been convicted of assault and battery in Case number 901 in Harrison County, thereby making him a habitual offender.

On February 5, 1998, Mitchell moved to strike or dismiss the indictment, on grounds that there were procedural deficiencies with regard to the record of the judgment in Case Number 900.  He also moved to strike the habitual offender portion of the indictment, on grounds that the charges from Case Number 900 and Case

Number 901 arose from the same incident. Because the highlighted language in the original indictment did not accurately charge Mitchell with capital murder, a new indictment, in Case Number B2402-98-00195, was filed on April 29, 1998. That indictment charged that he "did wilfully, unlawfully, and feloniously and of his malice aforethought, kill and murder . . . Patty Milliken . . . ." This second indictment also included Mitchell's convictions in Case Number 900 and Case Number 901. Mitchell claims that the trial court unconstitutionally permitted a later amendment to the second indictment, in violation of his due process rights. Respondents contend that this claim is barred because Mitchell omitted any reference to federal constitutional grounds in his argument to the state court.

Shortly after the second indictment was filed, Mitchell filed another motion seeking dismissal of the habitual offender charge, on the same grounds as before. On the day after this motion was filed, the trial court held a preliminary hearing, during which the problems with the indictment were discussed. At that point, counsel mentioned that Mitchell had other convictions, in Case Number 840 and 841. According to the prosecutor, "[O]n a later date through a written motion the State will be amending – requesting to amend its indictment for the habitual aspect to include these other arrests which are not obviously of the same day." The trial judge instructed him "to timely file that now." The prosecutor agreed and committed to submit the motion in writing.

A few days later, the State moved to amend the second indictment to add a conviction for assault and battery in Cause Number 840, as well as a conviction for

assault and battery with intent to maim in Cause Number 841. The motion does not contain a certificate of service, and, apparently, it was not served on defense counsel. However, the trial judge signed an order amending the habitual offender portion of the second indictment to add those charges, and that order was entered on June 23, 1998. A month later, the trial court entered another order requiring that the language "all being against the peace and dignity of the State of Mississippi" be added at the end of the new charges in the second indictment.

After the State completed its opening statements at trial, defense counsel noted that the prior indictment was still active, the State having failed to file a notice of nolle prosequi or to move to dismiss it. The defense's position was that Mitchell could not have been be re-indicted until that occurred and that it was too late to dismiss the first indictment after the jury was impaneled on the second indictment. The trial court denied that motion. This issue was raised on direct appeal, and Mitchell's entire argument on his first assignment of error – that the trial court erred in overruling his motion to dismiss the second indictment when the first was still pending – is recited below:

> Under Mississippi law, a capital murder charge or indictment is a create [sic] of statute. (See Section 97-3-19). Although the first indictment (96-263) specifically cited 97-3-19(2)(b), the indictment also contained the phrase "with or without deliberate design," which was language that was borrowed from Section 97-3-19(2)(3), the felony murder section of Mississippi's capital murder laws. On February 5, 1998, the defense filed "Defendant's Motion to Strike, and/or Amend Certain Portions of the Indictment Based upon Duplicity and Clerical Errors," which clearly pointed out that the first indictment in this case was basically flawed. Before this defense motion was set for hearing to be heard by the trial court, the state had secured the return of the second

10

indictment in this case, being Cause No. 98-195. Cause No. 98-195 was returned and filed on April 29, 1998. It certainly appeared that the first indictment in this case was fatally defective in that it made allegations that the defendant could be found guilty of capital murder by committing murder (with deliberate design) or even manslaughter (without deliberate design).

Whether a second indictment (on the exact charge contained within the first indictment) can be returned against a defendant while a first indictment is still active and pending, appears to be one of first impression in the State of Mississippi. However, in *State v. Thornhill*, it was stated, "If the order of the court was a nolle prosequi as contemplated by Mississippi Code Annotated Section 2566 (1942), the defendant may be reindicted. . . ." *State v. Thornhill*, 171 So. 2d 308, 310. Mitchell contends that the grand jury should not have been allowed to consider or return the second indictment against him while his first indictment was still active and pending.

(Amended Opening Br. 17-18)

Additionally, Mitchell argued that the court erred in signing the order permitting the amended indictment without giving him a chance to respond, as follows:

On June 4, 1998, the prosecution announced to the Court that in addition to the two convictions (900 and 901) that were originally listed on the indictment in Cause No. 98-195, Mitchell had two other convictions in Cause Nos. 840 and 841. On June 8, 1998, the prosecution filed its motion to amend without any notice to the defense. (C.R. Vol. 4, pg. 452-453). Furthermore, the trial judge's order amending (C.R. Vol. 4, pg. 459-461) the indictment reflects that the indictment was amended pursuant to an *ore tenus* motion from the state's prosecutor. (C.R. Vol. 4, pg. 459) (R.E. 161-3). The defense should have been noticed concerning this motion and given an opportunity to be heard. This is a clear example of a denial of due process in not affording the defense an opportunity to be heard.

Furthermore, assuming that aforementioned actions of the trial court were legal, Mitchell was at least entitled to be arraigned on the new amended indictment. This was not done. No defendant should be brought to trial for a capital offense without being properly arraigned in open court. Mitchell was not afforded the basic fundamental right.

(Amend. Br. 19-20)   Finally, Mitchell argued that the State failed to establish the

validity of his previous murder conviction in Cause No. 900, as shown below:

> The evidence clearly established that there was no written
> judgment of conviction in Cause No. 900, the Mitchell's [sic] purported
> murder conviction in 1975.  It was Cause No. 900 which served as the
> basis to allege that Mitchell was serving a life sentence.  The prosecution
> never presented any written judgment to the trial court to evidence the
> fact that Mitchell was indeed convicted in said Cause No. 900 in 1975.
> The defense contends that no written judgment of conviction existed.  No
> conviction judgment could be found in the files or docketed.  The
> prosecution skirted around this issue by relying upon the minute book
> entries.  However, the minute book entry as to Cause No. 900 is faulty.
> There is no judge's signature at the bottom of the order in the minute
> book.  This Court has stated, ". . . we hold that in order for a sentence to
> be valid, a judgment must be entered as of record." *Temple v. State*, 671
> So. 2d 58, 59 (Miss. 1996) (No. 93-KP-00286-SCT).

(Amend. Br. 36)

After the State responded with an argument based on state law, Mitchell

countered those arguments in kind, but did elaborate on his due process claim:

> Although not specifically stated as authority, Mitchell contends that "due
> process" rights are referred therein as those "due process rights" which
> are guaranteed under the constitutions of the United States of America
> and the State of Mississippi.  These "due process" constitutional rights
> guarantee citizens such as Mitchell a right to a hearing and a right to be
> heard before substantial rights can be affected.  The amending of an
> indictment in a capital murder case would be a substantial right.

(Appellant's Resp. Br. 4)

The Mississippi Supreme Court addressed all three issues.  With regard to the

first issue, that Mitchell could not be re-indicted when an indictment was pending for

the same offense, the court recognized that it was an issue of first impression. *Mitchell*

*v. State*, 792 So. 2d 192, 199 (Miss. 2001).  The court examined the issue from the

perspective of prejudice to Mitchell, and it determined that there was none; therefore, any error was harmless.

With regard to the trial court's permitting an amendment without response from the defendant, the court likewise affirmed the lower court. The court recognized that, in accordance with Rule 7.09 of the Uniform Circuit and County Court Rules, indictments may be amended as to form or to charge the defendant as a habitual offender, or to elevate the level of the offense. However, a defendant must be "afforded a fair opportunity to present a defense," and he must not be "unfairly surprised" by the amendment. *Id*. However, the court accepted the State's contention that the amendment did not place Mitchell in any worse position than he had been in previously, since he was charged as a habitual offender from the outset of the case. *Id*. at 201. Thus, the amendment only added convictions that should have been included in the beginning, but did not change the substance of the indictment. For this reason, the court held that the error in failing to permit Mitchell to respond was harmless. *Mitchell*, 792 So. 2d at 202.

Finally, the court addressed Mitchell's contention that the State did not properly establish the validity of his conviction for murder in Cause No. 900. The basis for the argument was the prosecutor's use of the minute book, rather than a written copy of the judgment. The Mississippi Supreme Court rejected this argument, noting that the minute book was signed by the trial judge at the end of the court term. Therefore, presenting the minute book was proper, and there was no merit to this argument. These arguments were not repeated in Mitchell's petition for post conviction relief.

In this Court, Mitchell argues that the late amendment to the indictment denied him the fundamental right to present a defense, in violation of the Sixth Amendment to the United States Constitution. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense.") He further contends that Rule 7.09 protects that right, by requiring that a defendant be permitted "to present a defense" prior to permitting an indictment to be amended. Mitchell never explains what his defense would have been, but he asserts that the Mississippi Supreme Court incorrectly found that he was not prejudiced by this error because the judge and the attorneys suggested to the jury that he could be sentenced to life with parole.

Once he was indicted as a habitual offender, the only two sentencing options available to Mitchell were death or life without parole. Therefore, Mitchell argues, the trial court failed to properly instruct the jury regarding his eligibility for parole, in violation of clearly established federal law. *Simmons v. South Carolina*, 512 U.S. 154 (1994). Additionally, without providing further details, Mitchell claims that the Mississippi Supreme Court's opinion "misconstrues the facts from the lower court surrounding the state's proposals to amend the indictment and therefore, effectively masks the prejudice incurred by the Petition as a result of the trial court's error." (Mem. Supp. Pet. for Writ of Habeas Corpus 14)

Respondents have countered that this argument is not exhausted, as the claim made in state court did not include any contention under the federal constitution, nor did it cite any federal authority whatsoever. Additionally, they point out that the state

14

court's decision rested entirely on state law. Respondents also claim that Mitchell has misinterpreted Rule 7.09, which requires only that a defendant be permitted to raise a defense to an amendment, not a defense to the underlying charge. Respondents contend that there is no violation of *Simmons*, as the facts of that case are inapposite to Mitchell's situation. According to Respondents, the jury was properly instructed that the only sentencing verdicts it could return were death, life without parole, or a failure to unanimously agree. This instruction was consistent with Mississippi law at that time, which had removed the option of life with parole as a punishment to a defendant convicted of capital murder. Thus, conviction as a habitual offender was meaningless in Mitchell's case. Finally, Respondents argue that any claim based on the sufficiency of the indictment was generally barred from consideration on federal habeas corpus review.

Mitchell's responsive argument on this issue to this Court was brief, repeating that the failure to serve his trial counsel with the motion to amend violated his Sixth Amendment right to present a defense. He failed to counter the exhaustion claims made by Respondents, only stating that the holding in *Simmons* applied to his case. He also reiterated his nonspecific argument that the state court had misconstrued the facts surrounding the amendment.

Respondents' exhaustion argument has merit. All applicants seeking federal habeas relief under § 2254 are required to exhaust all claims in state court prior to requesting federal collateral relief. *See Edwards v. Carpenter*, 529 U.S. 446 (2000); *Coleman v. Thompson*, 501 U.S. 722, 729-55 (1991); *Whitehead v. Johnson*, 157 F.3d

384, 387 (5th Cir. 1998). The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court in a manner that adequately developed the factual basis for the claim. *Williams v. Taylor*, 529 U.S. 420, 429-30 (2000). That presentation must also alert the state court as to the legal basis for the claim. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

In his appellate brief to the Mississippi Supreme Court, Mitchell made a passing reference to the federal guarantee of due process; however, he did not make the specific Sixth Amendment claim that he has made in this Court. The characterization of his claim as a state court issue was reflected in the Mississippi Supreme Court's opinion, which did not address federal constitutional law. Habeas law also requires Mitchell to present to the state court the "controlling legal principles" that he believes apply to the facts of his case. *Picard v. Connor*, 404 U.S. 270, 277 (1971). In *Picard*, the petitioner's claim was defaulted because his state court claims were based on state law, with only a passing reference to the Fourteenth Amendment, while he argued the Equal Protection Clause in his habeas petition. Later, in *Anderson v. Harless*, the Court dismissed a habeas claim on the constitutionality of a malice instruction given at trial. 459 U.S. 4, 7 (1982). Because the petitioner had only argued his claim under state law in state court, he could not make a due process claim under federal law in his habeas pleadings. *See also Howell v. Mississippi*, 543 U.S. 440, 444 (2005) (refusing to excuse litigant's failure to properly denominate his claim, noting that a litigant could raise a federal issue by simply labeling the claim "federal"); *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

In a similar case, the Fifth Circuit dismissed a habeas claim regarding the exclusion of an exculpatory statement at trial. *Wilder v. Cockrell*, 274 F.3d 255, (5th Cir. 2001). Wilder's state court arguments were predicated on state evidentiary rules, only mentioning the Fifth and Fourteenth Amendments. In his post conviction proceedings, he made a brief reference to the case of *Chambers v. Mississippi*, 410 U.S. 284 (1973). After he filed his habeas petition, the district court, apparently *sua sponte*, applied *Chambers* to hold that the exculpatory statement should have been admitted. The Fifth Circuit reversed, holding that the *Chambers* claim had not been exhausted in state court. In so doing, the court noted that the claims presented in state court were legally, logically and mechanically distinct from those presented in federal court, and Wilder's habeas petition was dismissed. 274 F.3d at 261-62.

Mitchell does not seriously argue that his claim is properly exhausted. The Court finds that it is not, and it is, therefore, barred from review. Alternatively, the claim is without merit. Mitchell contends that the jury was improperly informed that he would be eligible for life with parole, when his indictment as a habitual offender made that sentence inapplicable to him. He relies on *Simmons v. South Carolina*, 512 U.S. 154 (1994), to support his claim that his due process rights were thereby violated.

In *Simmons*, the defendant was a habitual offender whose status precluded parole. During closing argument in the defendant's capital murder trial, the prosecutor argued that death was an appropriate punishment because of the

defendant's future dangerousness.[3]  Conversely, defense counsel was prohibited by the trial judge from arguing that the defendant would not, in any event, be eligible for parole.  Even after the jury asked whether a life sentence would carry the possibility of parole, the trial judge refused to give an explanation, telling the jury they could not consider parole or parole eligibility.  *Id.* at 160.  The jury returned a sentence of death.

The Supreme Court reversed, holding that a jury considering future dangerousness as an aggravating factor would reasonably "view a defendant who is eligible for parole as a greater threat to society than a defendant who is not."  *Id.* at 163.  The Court noted that some information that could affect a prisoner's eligibility for early release is speculative and could confuse a jury; therefore, it recognized the advisability of a general rule deferring to the states to determine what information should be given to a jury regarding parole.  However, the Court also held that a different result should apply in situations like Simmons's:

> But if the State rests its case for imposing the death penalty at least in part on the premise that the defendant will be dangerous in the future, the fact that the alternative sentence to death is life without parole will necessarily undercut the States's argument regarding the threat the defendant poses to society.  Because truthful information of parole ineligibility allows the defendant to "deny or explain" the showing of future dangerousness, due process plainly requires that he be allowed to bring it to the jury's attention by way of argument by defense counsel or an instruction from the court. [Citation omitted.]

*Id.* at 168-69.  Holding that Simmons was denied his right to defend the State's charge that he was a continuing danger to society, and finding that the instructions given by

---

[3]In South Carolina, the State is not limited to the statutory aggravating factors, and future dangerousness may be argued as an aggravating factor.

the trial court failed to satisfy that right, the Court concluded, "The State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole." *Id.* at 171.

The decision in *Simmons* fails to support Mitchell's argument for several reasons. First, future dangerousness is not an issue that can be argued in a death penalty case in Mississippi, as prosecutors here are limited to the statutory elements outlined in Miss. Code Ann. § 99-19-101(5) (1972), which do not include future dangerousness.[4] Second, Mitchell's complaint is not that the unavailability of parole was kept from the jury. Instead, he argues that the jury should **not** have been told that he was ineligible for parole. Aside from the fact that a sentence of life with the possibility of parole was not an option for the jury, Mitchell does not explain how a jury that returned a sentence of death could have been favorably influenced by being informed that there was a possibility that Mitchell could be paroled. It is impossible to determine how his due process rights were violated by the failure to discuss with the jury a sentencing option that was unavailable to him and that might reasonably be regarded by the jury as a less acceptable alternative to life without parole.

Mitchell's claim was not exhausted in state court and is, therefore, procedurally barred from consideration. In any event, for all of the reasons discussed above, no constitutional right was violated by the amendment to the indictment, nor was the

---

[4]Mississippi law does, however, require that jurors be informed when a capital defendant is ineligible for parole. *Turner v. State*, 573 So. 2d 657 (Miss. 1990).

state court's opinion an unreasonable application of federal law. Habeas relief is not warranted on this issue.

**B.    Petitioner's rights were violated under the Fourth Amendment of the Federal Constitution because the Petitioner's warrantless arrest constituted an unreasonable search and seizure.**

> **B-1.    When police officers arrived at Petitioner's home, they lacked the requisite probable cause to effectuate a warrantless arrest.**

> **B-2.    The Petitioner's flight from the Biloxi police officer in Petitioner's own backyard did not create probable cause for the warrantless arrest and did not constitute a violation of Mississippi law, justifying Petitioner's warrantless arrest.**

Because these issues are so factually related, they may be discussed together. The facts surrounding Mitchell's arrest are generally set out in the state court's opinion, which is quoted at length above. At trial, Mitchell was originally represented by Keith Roberts, as lead counsel, and Tom Musselman. A conflict arose between Mitchell and Roberts, and, ultimately, Roberts was replaced by Keith Pisarich, who served as defense counsel for the remainder of the case, along with Musselman. During the time that Mitchell was represented by Roberts, he filed several *pro se* motions, one of which was a Motion to Suppress the Statements, by which Mitchell argued that his confession was involuntary and illegally obtained. Later, Roberts filed a similar motion; however, neither of these motions discussed the particulars of Mitchell's arrest. A hearing was held on these motions, at which the officers who took the statement from Mitchell, as well as Mitchell himself, testified. Based on that testimony, the trial judge found that the statement was voluntary.

After Pisarich was appointed, he filed a motion to reopen the hearing, in order to present additional evidence. In conjunction with that motion, Pisarich filed a new motion to suppress Mitchell's confession, based on a claim that his warrantless arrest was illegal. Pisarich also filed a motion to suppress the physical evidence from the search, on grounds that the search warrant was void. Because the case number had changed after the first amended indictment, these motions were refiled. Pisarich also submitted a motion to suppress any evidence that resulted from the illegal trespass by law enforcement on the property owned by his grandfather. Mitchell's original *pro se* motions were combined and re-filed, as well.

A second hearing was held on the new motions on April 2, 1998, at which time the officers who participated in the pursuit and arrest of Mitchell testified. Officer McKaig testified that, around midnight on the evening that Patty Milliken went missing, he and Officers Doucet and Matory arrived at Mitchell's grandfather's home in a police car, wearing police uniforms. Doucet and Matory went to the front door, and Doucet instructed McKaig to go to the back of the house, to watch the back door. According to McKaig, the officers were there for the sole purpose of talking to Mitchell, not to arrest him. When McKaig came around the side of the house, Mitchell was standing in the back yard, and he said, "Who's that?" McKaig answered, "It's the police." Mitchell asked what they wanted, and McKaig told Mitchell that they wanted to talk to him. Mitchell "took off running," with McKaig in pursuit, telling him to "halt." Eventually, McKaig lost sight of Mitchell. Ultimately, McKaig was the officer who filled out the custody form, which reflected that Mitchell was arrested for reckless

driving, disorderly conduct, and resisting and obstructing arrest. Officer Doucet echoed McKaig's testimony that the officers were going to see if Mitchell would voluntarily talk with them about Milliken, as they had no warrant. He also corroborated McKaig's version of the pursuit, stating that he heard McKaig identify himself as a Biloxi policeman and instruct Mitchell to stop running.

Rick Dawson was a K9 officer who was patrolling on the night Milliken disappeared. He had heard the instruction to be on the lookout for Mitchell's car, which he spotted at a Shell station on Highway 90 in Biloxi. Dawson passed the station on Highway 90 and made a U-turn to take another look. When he did, the man who was pumping gas into the car threw down the gas hose, got in the car, and began driving in the other direction. Dawson followed the vehicle down Highway 90 and up a side street, in order to get Mitchell's tag number. He saw Mitchell run a red light. At that point, Dawson testified that he turned on his blue lights, although defense counsel pointed out that his report does not state that Mitchell ran a red light.

The transcript reflects that the hearing ended abruptly after Dawson's testimony, with no argument and no ruling. In a hearing held a month later, neither the attorneys nor the trial judge could remember why they ended the hearing with no ruling. The court requested a transcript of the earlier hearing and took the matter under advisement. A few months later, the motion was again brought before the court, in the context of a tape of Mitchell's confession. At that time, Mitchell testified regarding the events preceding his arrest. According to Mitchell, Officer Dawson

turned his blue lights on **immediately after** he saw Mitchell at the Shell station and turned around, but before Mitchell turned up the side street.

Defense counsel argued that the testimony presented showed that the police had no probable cause to believe that Mitchell had committed a crime at the time that they arrived at his grandfather's house. Accordingly, he argued, Mitchell was within his rights to leave the premises prior to being questioned. Finally, Mitchell's attorney argued that the timing of the pursuit indicated on the officer's report, as well as Mitchell's testimony, made it clear that McKaig turned on his lights and "pursued" Mitchell prior to the time that McKaig observed Mitchell actually commit a crime. For that reason, he argued, Mitchell's arrest was illegal, and any evidence obtained as a result of that arrest was inadmissible. The court considered Mitchell's testimony, as well as what had been presented in the April hearing, viewed the video of the pursuit and made the following ruling:

> Before the Court rules I want to make a record, and I think the Court can take judicial notice, and certainly with all of us having lived in Biloxi, and at least two of us knowing how to pronounce Croesus, we ought to be able to come up and take judicial notice as to the distance between the Shell Service Station to the corner of Caillavet and to the signal light at the corner of Caillavet and Highway 90.

> . . . .

> What would you say is the distance from the Shell Service Station, which would be probably the west exit of the Shell Service Station at or around the contiguous line with the old Western Sizzler to Caillavet Street, maybe 400 to 500 feet?

> . . . .

So at best the car that Mr. Mitchell allegedly was in, and the car that the police were in, traveled approximately 1,400 to 1,500 feet before the car – before the alleged, if it happened, light was run. . . .

Based on the record made at the April 2rd hearing date, together with the record which was made today, the Court is of the opinion that its previous ruling was well taken, and I will overrule the motion once again of the defendant.

Later in that hearing, the court considered the question of whether the police illegally trespassed on Mitchell's grandfather's property, making Mitchell's arrest, which was the ultimate result of the trespass, illegal, and any evidence obtained thereby inadmissible. Mitchell testified that he had been staying at his grandfather's house for about a week before Milliken's murder, and he had his own room there. He also said that his grandfather owned that property and that no one had given Officer McKaig permission to enter it. The court's ruling was as follows:

It's the Court's belief that the action of the police, and again I'm incorporating the record which was made in April, 98, as well as today, that the act of the police going upon the property of, I assume, the grandfather was not done for a wrongful purpose. I'm not able in this short period of time to be convinced concerning the issue of the title, but I think that it has to be willful or malicious, that is done for wrongful purposes and I don't believe that it was in this case.

Second of all, it has to be upon the property of another. Certainly the State is not claiming that it was their property, but the Supreme Court in <u>Johnston versus State</u>, which I was able to just pick up from Judge Grant, states that the Supreme Court had to consider whether the State offered sufficient evidence supporting title to the land in the Mengs [sic] to make the question of ownership an issue for the trier of facts or law. Again it might be overruled. I don't have a Shepard. I'm relying on the totality of the circumstances in this case, all the information that was available to the police, and certainly I don't think that the motion in this case is well taken and I'll deny that motion.

These issues were raised on direct appeal. In its opinion, the state court began

by setting out the facts known by police prior to their visit to the Croesus Street home:

> (1) Milliken had worked the 4:00-8:00 p.m. shift at the Majik Mart
> on November 21, 1995; (2) surveillance video at the store showed Mitchell
> coming into the store three different times that day talking to Milliken;
> (3) Milliken's coworker saw Milliken write down Mitchell's telephone
> number in her address book; (4) Milliken telephoned her son to inform
> him she would be home in fifteen minutes; (5) Milliken had left her
> personal belongings inside the store and stated that she was going
> outside to smoke a cigarette with Mitchell; (6) Milliken walked with
> Mitchell out of the store; (7) ten minutes later, Milliken's coworker
> stepped outside to ask her a question and realized that she was gone; (8)
> Milliken's car was still parked at the store; (9) two hours after Milliken
> had gone outside with Mitchell, she had still not returned, her personal
> effects were still at the store, and she had not gone home; (10) Milliken's
> coworker had called the police concerned about Milliken's whereabouts;
> (11) Milliken's coworker had told the police about Mitchell's visits,
> showed them the surveillance video, and Mitchell's telephone number in
> Milliken's purse; (12) the police had cross-referenced the telephone
> number, learned of Mitchell's address, and proceeded to 323 Croesus
> Street to see if Mitchell knew of Milliken's whereabouts.

*Mitchell v. State*, 792 So. 2d at 203. After examining these facts, the court recognized

that the test for probable cause in Mississippi is "the totality of the circumstances."

*Id.* (quoting *Haddox v. State*, 636 So. 2d 1229, 1235 (Miss. 1994)). Probable cause has

been further defined as "a practical, nontechnical concept . . . . [that] arises when the

facts and circumstances of an officer's knowledge, or . . . reasonably trustworthy

information, are sufficient . . . to justify a man of average caution in the belief that a

crime has been committed and that a particular individual committed it." *Mitchell*,

792 So. 2d at 203 (quoting *Conway v. State*, 397 So. 2d 1095, 1098 (Miss. 1980)).

Considering the information summarized above, the court held that it was not

unreasonable for the officers who went to the Croesus Street house to believe that a

crime had been committed against Milliken and that Mitchell was connected to that crime. *Mitchell*, 792 So. 2d at 203. Having that belief, the officers could have investigated the crime through a voluntary conversation or an investigative stop, even without probable cause. *Id*. at 203-04. Although the officers chose to attempt a voluntary conversation with Mitchell, they had sufficient justification to detain him, with force, if necessary, to ask questions. *Id*. at 204 (citing *Kolendar v. Lawson*, 461 U.S. 352, 367 (1983)). That being the case, the orders for Mitchell to halt were legitimate, and Mitchell's flight converted reasonable suspicion to probable cause. *Mitchell*, 792 at 204 (citing *Sibron v. New York*, 392 U.S. 40, 66-67 (1968) ("[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest.")). The court concluded that the officers had probable cause to arrest Mitchell when the BOLO was issued, and certainly when the car pursuit began; therefore, the arrest was legal. *Mitchell*, 792 So. 2d at 205. This issue was raised again in Mitchell's petition for post-conviction relief, but the court found that it was procedurally barred and, in any event, without merit. *Mitchell v. State*, 886 So. 2d 704 (Miss. 2004).

In this Court, as a preliminary matter, Mitchell argues that the doctrine of judicial restraint that normally precludes federal habeas review of Fourth Amendment claims should not apply to him. In *Stone v. Powell,* 428 U.S. 465, 494 (1976), the Supreme Court held "[W]here the state has provided an opportunity for full and fair

consideration of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *See also, Lofton v. Whitley*, 905 F.2d 885, 889, n.5 (5th Cir. 1990); *Bell v. Lynaugh*, 828 F.2d 1085, 1091-92 (5th Cir. 1987). This preclusion acts as a bar to habeas relief "absent a showing that the state prisoner was denied an opportunity for a full and fair litigation of that claim at trial and on direct review." *Davis v. Blackburn*, 803 F.2d 1371, 1372 (5th Cir. 1986) (quoting *Stone v. Powell,* 428 U.S. at 494 n.37). The burden is on the habeas petitioner to plead and prove the denial of a full and fair hearing in state court. *Davis*, 803 F.2d at 1372.

Mitchell claims that Respondents waived this argument by failing to include it as an affirmative defense in their Answer to his Petition. Respondents counter by arguing that they raised *Stone* implicitly in their boilerplate denial that the petition raised a claim upon which relief may be granted. That is not a persuasive argument, and Respondents do not appear to seriously press it. Additionally, however, they cite *Davis* for the proposition that, although the *Stone* limitation to review is not jurisdictional, a federal court may raise its prudential limitation *sua sponte*. 803 F.2d at 1372-73. In making that ruling, the Fifth Circuit cited language in an earlier holding recognizing that *Stone* put the burden on habeas petitioners to plead and prove lack of opportunity to litigate Fourth Amendment claims. *Id*. at 1372 (citing *Caver v. Alabama*, 537 F.2d 1333, 1336 n.2 (5th Cir. 1976)). Additionally, the court analogized *Stone's* limitation to review to the Supreme Court's treatment of standing questions.

27

Just as the Supreme Court has invoked the doctrine of standing *sua sponte* to dismiss claims, the Fifth Circuit in *Davis* held that protection of the policy considerations of comity and finality justified the court's *sua sponte* invocation of *Stone*.

Mitchell argues that *Davis* merely gave federal courts the discretion to invoke the *Stone* doctrine *sua sponte*; therefore, they also have discretion to consider a Fourth Amendment claim where the *Stone* doctrine was not asserted by the State. Additionally, Mitchell claims that the Federal Rules of Civil Procedure and the Rules Governing Section 2254 Cases in the United States District Court place the burden on Respondents to raise any such affirmative defense. The second argument is not persuasive; clearly, *Davis* was a case that arose under the habeas rules and the Rules of Civil Procedure, and the Fifth Circuit applied *Stone* on its own motion. It does not appear, moreover, that the court viewed the application of the doctrine as discretionary. After reviewing the Supreme Court's invocation of the standing doctrine on its own motion, the Fifth Circuit's opinion stated, "Similarly, we are obliged to apply *Stone* as a prudential limitation on the exercise of our jurisdiction here, even if it must be raised *sua sponte*." 803 F.2d at 1372-73. For these reasons, the prudential limitation on review of Fourth Amendment claims in habeas matters should be applied in this case.

The Fifth Circuit has interpreted *Stone* to require a litigant attempting to overcome it to show "that the processes provided by a state to fully and fairly litigate fourth amendment claims are routinely or systematically applied in such a way as to prevent the actual litigation of fourth amendment claims on their merits . . . ."

*Williams v. Brown*, 609 F.2d 216, 220 (5th Cir. 1979). An error in adjudicating a Fourth Amendment claim does not amount to a deprivation of a full and fair hearing. *Moreno v. Dretke*, 450 F.3d 158, 167 (5th Cir. 2006). Mitchell, who admittedly had three hearings on his motions to suppress as well as extensive appellate review of his claims, has not established that the State failed to provide him with a full and fair opportunity to litigate them. Therefore, pursuant to *Stone*, this claim cannot be the basis for habeas relief.

Even if *Stone* were not applied to Mitchell's case, however, he could not succeed on the merits of his claim. Although there was no further argument from Respondents, habeas law requires this Court to review the opinion of the state court to determine whether it unreasonably applied federal precedent. Instead of reviewing the Mississippi Supreme Court's opinion and discussing possible error in light of AEDPA standards, Mitchell has conducted his own de novo review, reciting the evidence set forth at trial and putting his own interpretation on it. However, this Court is obligated to accept the facts found by the state court, unless they are unreasonable, based on the evidence presented. 28 U.S.C. § 2254(d)(2). This Court is further obligated to accept the state's court decision that is based on those facts, so long as it does not unreasonably apply federal law. Mitchell has failed to demonstrate in his brief that either situation exists.

Instead, Mitchell places great emphasis on the officers' testimony at the suppression hearing that, at the time they visited the Croesus Street house, they intended only to talk with Mitchell, not to arrest him. That testimony does not refute

the facts found by the Mississippi Supreme Court, nor does it establish that their suspicion of him was unreasonable. When the officers went to the Croesus Street house, they knew that Milliken had walked out of her store with Mitchell after stating her intent to smoke a cigarette in the parking lot and return within minutes. Mitchell had come into the store on multiple occasions that day to speak with Milliken. She informed her family that she would be coming home shortly, and she left her personal belongings inside the store. Within minutes after walking outside, she and Mitchell had disappeared. Two hours passed, and she did not return to the store or contact her family members. It was not unreasonable for the state court to find that, at that point, the officers had a reasonable suspicion that Milliken had been prevented in some fashion from returning and that Mitchell was involved in her disappearance, or at least had knowledge of her whereabouts.

The Mississippi Supreme Court held that probable cause to arrest Mitchell was established by his flight from the officers who came to his grandfather's house. Clearly established federal law provides that a police officer may make a warrantless arrest of an individual if the officer has probable cause to believe that the individual has committed a felony. *Maryland v. Pringle*, 540 U.S. 366, 369-70 (2003); *United States v. Watson*, 423 U.S. 411, 417 (1976). As the state court recognized in Mitchell's case, probable cause is a standard not susceptible of a precise definition and depends upon the totality of the circumstances. *Pringle*, 540 U.S. at 371; *Illinois v. Gates*, 462 U.S. 213, 232 (1983) ("[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to

30

a neat set of legal rules."). In a situation where a person is missing under circumstances suggesting an involuntary departure, there may be probable cause to arrest the person most likely involved in the disappearance. *See, e.g., Gliatta v. Jones*, 96 F. App'x 249 (5th Cir. 2004). *See also United States v. DeQuasie*, 373 F.3d 509, 522-23 (5th Cir. 2004); *United States v. Hibbard*, 963 F.2d 1100, 1101-02 (8th Cir. 1992); *United States v. Giacalone*, 541 F.2d 508, 515 (6th Cir. 1976); *United States v. Rundle*, 437 F.2d 204, 205-06 (3rd Cir. 1971).

Although the officers testified that they went to Mitchell's house to question him, and not, necessarily, to arrest him, that testimony does not negate a finding of probable cause. As the Supreme Court has made clear, "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (citing *Whren v. United States*, 517 U.S. 806, 812-13 (1996); *Arkansas v. Sullivan*, 532 U.S. 769 (2001) (*per curiam*)). Adding to the knowledge already possessed by the officers was Mitchell's flight after being confronted by Officer McKaig and, again, after spotting Officer Dawson. *Sibron v. New York*, 392 U.S. 40, 66-67 (1968). Where police officers clearly identify themselves, a suspect's attempt to escape may "serve as the catalyst to convert mere reasonable suspicion to probable cause." *United States v. Holloway*, 962 F.2d 451, 461 (5th Cir. 1992) (quoting *United States v. Amuny*, 767 F.2d 1113, 1124 (5th Cir. 1985)). Milliken had disappeared just hours before under suspicious circumstances and in the company of Mitchell. Mitchell's actions when police attempted to question him about her disappearance were sufficient to convert suspicion into probable cause. Because

they had probable cause to arrest Mitchell, the fact that they did so without a warrant did not violate the Fourth Amendment to the Constitution of the United States.

This issue is barred from review by this Court under the precedent of *Stone v. Powell*, even though Respondents failed to adequately raise that issue in their pleadings. If the issue is reviewed, however, it is clear that the Mississippi Supreme Court's analysis is completely in accord with clearly established federal law on the issue of probable cause. The state court found that Biloxi police had ample evidence with which to detain Mitchell at his grandfather's house, and they certainly had enough to arrest Mitchell after he fled from them twice. Mitchell has not established, under the standards required for habeas review, that the state court's decision was contrary to or involved an unreasonable interpretation of federal law. He has likewise failed to establish that the decision was based upon an unreasonable interpretation of the evidence presented to the trial court. For all of these reasons, habeas relief is not available on this issue.

**C.** **Petitioner was denied his Fourth Amendment rights against unreasonable searches and seizure; therefore, the trial court erred in overruling Petitioner's motion to suppress all evidence resulting from the search.**

This claim involves the seizure of Mitchell's clothes after his arrest for misdemeanor traffic offenses. According to Mitchell, the seizure was invalid because it was not temporally or substantively related to the matters for which he was arrested. Furthermore, Mitchell argues that the warrant that was obtained for his person was invalid as a matter of Mississippi law. Respondents contend that review on this issue is barred for the same reasons offered in the previous section – that it is a Fourth Amendment claim barred from review by *Stone v. Powell.* 428 U.S. 465 (1977). For the reasons more fully explained in the preceding section, the same result should apply here.

Again, Respondents presented no argument on this issue beyond their assertion that consideration is barred under *Stone*. However, because this Court's focus is on the validity of the state court opinion, the facts underlying it should be reviewed. Milliken disappeared after 8:00 p.m. on November 21, 1995. Mitchell was arrested at approximately 12:30 a.m. the next day, after a high speed chase. The charges listed on the Custody Form are: resisting arrest by fleeing, disorderly conduct, reckless driving, and obstructing arrest-vehicle pursuit. During the booking process, officers discovered that Mitchell was on parole. He gave a videotaped statement, in which he admitted leaving the store with Milliken, getting into an altercation with her, and

hitting her across the face.[5]   Millken's body was found at approximately 7:14 that morning.  At about 1:07 that afternoon, investigators met with Mitchell again, and this time he apparently gave a more complete videotaped statement of what had occurred, although the exact contents of that statement do not appear in the record.  During the time they were meeting with Mitchell, a warrant was obtained for a search of Mitchell's person, and that warrant was executed after the second interview, when investigators took samples for a rape suspect kit, as well as seizing Mitchell's clothing.  A warrant was also issued that day for his arrest on parole violations.  Later that evening, at 5:00 p.m., Mitchell was arrested for murder, and that warrant was executed at 2:00 p.m. the next day.

As to the merits, in its review of this issue, the Mississippi Supreme Court initially viewed this police action as an inventory search, but concluded that it did not meet the criteria for validity.  *Mitchell v. State*, 792 So. 2d at 207.  However, the court went on to hold that the search was incident to a valid warrantless arrest, although it was not conducted until some time later.  *Id*.  In making that determination, the court relied on *United States v. Edwards*, 415 U.S. 800, 801 (1974) and *Rankin v. State*, 636 So. 2d 652, 657 (Miss. 1994).  Mitchell argues that this reliance is misplaced, as the search conducted in *Edwards* was conducted to obtain evidence of the crime for which Edwards was arrested.  415 U.S. at 804-05, 806.  Here, in contrast, Mitchell was

_____

[5]As stated earlier, the statement was videotaped, but neither the tape nor a transcript was produced as part of the state court record.  The contents of the statement have been gleaned from testimony at trial.

arrested for various misdemeanor offenses, but his clothing was seized as possible evidence for the murder charges.

In *United States v. Robinson*, 414 U.S. 218 (1973), the Court upheld the warrantless search of a person arrested for a traffic violation, where the search resulted in seizure of heroin capsules:

> Since it is the fact of custodial arrest which gives rise to the authority to search, it is of no moment that [the officer] did not indicate any subjective fear of the respondent or that he did not himself suspect that respondent was armed. Having in the course of a lawful search come upon the crumpled package of cigarettes, he was entitled to inspect it; and when his inspection revealed the heroin capsules, he was entitled to seize them as 'fruits, instrumentalities, or contraband' probative of criminal conduct.

*Id*. at 236 (quoting *Harris v. United States*, 331 U.S. 145, 154-55 (1947)). Other federal courts have construed *Edwards* and *Robinson* in tandem to conclude that the warrantless search and seizure of an arrestee's clothing is lawful, even after some period of time has elapsed since the arrest, and even if the clothing is used to establish evidence of another crime. *Barry v. Ficco*, 392 F. Supp. 2d 83, 96 (D. Mass. 2005); *United States v. Moclavo-Cruz*, 662 F.2d 1285, 1290 (9th Cir. 1981) (holding search of a person's clothing would be lawful, although search of a purse was not); *Westberry v. Mullaney*, 406 F. Supp. 407, 413-14 (D.C. Me. 1976), *aff'd,* 535 F.2d 1333 (1st Cir. 1976). *But see United States v. Mills*, 153 U.S. App. D.C., 156, 164, 472 F.2d 1231, 1239 (1972) (holding that individual held on petty offense should have been advised of opportunity to post bail, and evidence of collateral crime that was taken during an unjustified confinement was unlawfully seized).

AEDPA standards require that a court considering habeas relief determine whether the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1). A state court opinion can run afoul of this standard in several ways:

> [A] state court acts contrary to clearly established federal law if it applies a legal rule that contradicts our prior holdings or if it reaches a different result from one of our cases despite confronting indistinguishable facts. The statute also authorizes federal habeas corpus relief if, under clearly established federal law, a state court has been unreasonable in applying the governing legal principle to the facts of the case. A state determination may be set aside under this standard if, under clearly established federal law, the state court was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled.

*Ramdass v. Angelone*, 530 U.S. 156, 165-66 (2000) (citing *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). For purposes of habeas analysis, clearly established federal law "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." *Id.* at 412. Where there is no Supreme Court case applicable to the facts underlying the state court's decision, it cannot have violated clearly established federal law. *Carey v. Musladin*, 549 U.S. 70, 76 (2006) (holding that precedent articulating the test for inherent prejudice resulting from state conduct could not be applied to the conduct of spectators to a trial).

Here, the Mississippi Supreme Court cited *Edwards* for the proposition that a lawful custodial search could be conducted several hours after an arrest, where the evidence seized thereby did not support the charges causing the arrest. *Edwards* does

36

not specifically state that such a search is permissible; however, despite Mitchell's argument to the contrary, the case does not specifically say that such a search is impermissible. Instead, *Edwards* recognizes that an arrestee and "the property in his immediate possession" may be searched at the police station following an arrest at a different location. 415 U.S. at 803. The opinion also confirms that an arrestee's clothing may be seized upon his arrival at the police station and tested later. *Id*. If done in accordance with standard police practice, an arrestee's clothing may be taken from him at any point that did not constitute "unreasonable delay." *Id*. at 804.

Justice White began the opinion in *Edwards* by stating, "The question here is whether the Fourth Amendment should be extended to exclude from evidence certain clothing taken from respondent Edwards while he was in custody at the city jail approximately 10 hours after his arrest." 415 U.S. at 801. Clearly, the Court's focus was on the temporal proximity of the search to the arrest, rather than the relevance of the evidence seized to the original charges. Any language not relevant to the question presented would be dicta. At one point, the Court sanctioned the actions of the police because "it became apparent that the articles of clothing were evidence of the crime for which Edwards was being held . . . ." *Id*. at 806. Later, the opinion stated that it was permissible to take his clothing and examine it "particularly in view of the existence of probable cause linking the clothes to the crime." *Id*. Nowhere, however, does the Court specifically state that its holding was limited to circumstances in which the evidence seized supported the charge for which the original arrest was made. *Edwards* concludes with the following language, "'While the legal arrest of a person should not destroy the

privacy of his premises, it does – for at least a reasonable time and to a reasonable extent – take his own privacy out of the realm of protection from police interest in weapons, means of escape and evidence.'" 415 U.S. at 808-09 (quoting *United States v. DeLeo*, 422 F.2d 487, 493 (1st Cir. 1970)).

As stated earlier, on habeas review, this Court must decide whether there is clearly established federal law that applies to Mitchell's case, either expressly or through a proper extension. That law must be based on the holdings, not the dicta, of the Supreme Court. There does not appear to be any case that holds that the Fourth Amendment is violated by a seizure of clothing several hours after arrest to use as evidence of a crime other than the one for which the arrestee is held. *Robinson*, 414 U.S. 218, held that the police may arrest a person on one charge, but then, as part of a custodial search, seize evidence of another crime. *Edwards* held that the police may arrest a person and conduct a custodial search at a later time. *Edwards* may suggest that the later custodial arrest should be for evidence of the original charge, but there is no express holding that the search must be so limited. Moreover, this Court has already held that the police had probable cause to arrest Mitchell in connection with Milliken's disappearance at the time that he was charged with traffic offenses. Between that time and the time that his clothing was taken, Milliken's body had been discovered, and Mitchell had given two statements implicating himself in her murder. In this situation, there is no applicable Supreme Court case that holds that his clothing could not be seized at the time that it was taken. That being so, there cannot be any clearly

established federal law that was abrogated by the Mississippi Supreme Court's opinion. *Musladin*, 549 U.S. 70 at 76.

Finally, even if this was error, it was harmless error. Harmless error analysis can be applied to a Fourth Amendment challenge to the introduction of evidence. *Chambers v. Maroney*, 399 U.S. 42, 51 (1970). The standard for determining whether an error was harmless is whether it "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Here, the only reference that was made to the clothing at trial was through Debra Haller, a witness from the State Crime Lab. Haller testified that Mitchell's clothing contained human blood. However, the blood from his clothing was never matched with the samples taken from Milliken, nor was the blood from the rape kit analyzed. Given the other evidence that was presented to the jury to establish Mitchell's guilt, this Court holds that any error in seizing Mitchell's clothing had little or no effect on the jury's verdict and was, therefore, harmless. For all of these reasons, the Fourth Amendment was not violated by the seizure of Mitchell's clothes after his arrest for traffic violations, and he is not entitled to habeas relief on this issue.

**D.  Petitioner was denied his Sixth Amendment right to effective assistance of counsel during the guilt and sentencing phases of trial.**

Mitchell was represented by three attorneys at trial – Keith Roberts, original lead counsel, Keith Pisarich, who replaced Roberts, and Tom Musselman, who was associate counsel throughout. Mitchell claims that Roberts failed to adequately

investigate potential mitigating evidence and that Pisarich and Musselman failed to investigate and present an adequate mitigation case, caused in part by failing to hire a mitigation expert, as well as by failing to adequately investigate Mitchell's personal background. Due to this alleged ineffectiveness, the jury was not presented with evidence of Mitchell's mental illness and mental retardation.

Respondents argue, initially, that this claim is barred in part, because it was not raised in this manner in state court. In particular, Respondents claim that Mitchell presented his claim solely with reference to evidence of mental retardation, and not relative to a claim of mental illness. Having reviewed the post-conviction pleadings presented by Mitchell in state court, it appears that Respondents have raised a valid defense. Mitchell is foreclosed from seeking review of this issue unless, before seeking federal relief, he exhausted this claim in state court by presenting the substance it to the highest state court by adequately developing the relevant facts and by alerting that court to the legal basis for it. *See Baldwin v. Reese*, 541 U.S. 27, 29 (2004)*; Edwards v. Carpenter*, 529 U.S. 446 (2000); *Williams v. Taylor*, 529 U.S. 420, 429-30 (2000); *Coleman v. Thompson*, 501 U.S. 722, 729-55 (1991).

In his petition for post-conviction relief to the Mississippi Supreme Court, Mitchell's ineffectiveness claim relative to this issue was captioned, "Petitioner's Grounds for Ineffective Assistance of Counsel Claim, I. Counsel's Duty to Investigate and Present Mitigating Evidence: Failure to Investigate and Present Evidence of Mental Retardation to Sentencing Jury." After discussing the law on this issue,

Mitchell presented the following summary of the evidence that should have been presented:

> Even a cursory examination of Mitchell's childhood school records, military records, the findings of prior mental evaluations, employment records together with other psychiatric and psychological records would have readily revealed potent mitigation matters for the trial jury's consideration. The records would have revealed to trial counsel that Mitchell had been previously diagnosed on more than one occasion as being mildly mentally retarded. The diagnosis is amply supported by records indicating that he suffered from deficits in adaptive behavior in two or more of the recognized areas as set forth by the AAMR. Additionally, the evidence is clear that Mitchell was discharged from the military due to his unsuitability. Mitchell, in short, since his early childhood has consistently attained I.Q. scores that fall well within the range as set forth in *Atkins v. Virginia*. Likewise, his mental condition of retardation had on [sic] onset well before his attaining the age of eighteen years of age. [Footnote omitted.] The mentioned records were easily obtainable and would have been extremely relevant and material mitigation matters for the sentencing jury's consideration. Had the jury learned of these matters, the outcome of the trial might have been substantially different. Mitchell was unduly prejudiced by the lack of mitigation investigation and denied a fundamental right. *See, Exhibits 11-18, 19-22, 24.*
>
> . . . .
>
> In view of the above authorities cited, the petitioner states that his trial counsel had a duty to investigate his mental illnesses and mental retardation. Trial counsel was neglectful and [sic] that they failed to do so and as a result, the trial jury never had an opportunity to consider evidence of mental retardation as mitigation. [Footnote omitted.]

(Pet. for PostConviction Relief 16-19)

The State's response focused entirely on the claim that Mitchell was mentally retarded. In response to the State's claim that the evidence Mitchell argued should have been presented to the jury was largely unfavorable to him, Mitchell argued, "The State highlights the propensity of Petitioner to become involved in altercations, to be

classified as an undependable worker and to be discharged from the army due to unsuitability. These very factors are indicia of mental retardation and directly reflect on the adaptive skills deficit of the individual." (Rebuttal Br. 6-7) Later, Mitchell asserted:

> While a thorough mitigation evaluation with a social history taken by a professional forensic social worker would have shown the previous serious criminal history, it would have also shown the limited mental abilities of petitioner along with psychologist and psychiatrist reports which indicate both auditory and visual hallucinations, a "drowsy state EEG," his unusual behavior of "staring into space," the circumstance of his firing from a shipyard because he lacked the adaptive skills to get along with his co-workers and his attempt to correct his drug problems by going into the treatment center, Harbor House, in Jackson, Mississippi.

(Reb. Br. 8)

The Mississippi Supreme Court construed Mitchell's claim as contenting "that trial counsel should have developed and presented evidence of mental retardation during the sentencing phase of the trial." *Mitchell v. State*, 886 So. 2d 704, 705 (Miss. 2004). Concluding that Mitchell was not retarded, the court held, "Consequently, trial counsel cannot be faulted for failing to present mitigating evidence which did not exist." *Id.* at 709. Mitchell's motion for rehearing did little to disabuse the court of its characterization of his argument, merely repeating the language from his petition.

As stated in a previous section of this Opinion, the law requires Mitchell to present to the state court the "controlling legal principles" that he believes apply to the facts of his case. *Picard v. Connor*, 404 U.S. 270, 277 (1971). The Fifth Circuit has barred a habeas claim of ineffective assistance of counsel where the petitioner generally argued ineffectiveness at the mitigation stage in state court, but added claims of

42

ineffectiveness during voir dire and closing to his habeas petition. *Ries v. Quarterman*, 522 F.3d 517, 526 (5th Cir. 2008). Here, Mitchell's claims all relate to his attorneys' failure to use available and potentially persuasive mitigation evidence during the sentencing phase of his trial. In state court, he argued that evidence of his mental illness should have been presented to the jury, but only to bolster his contention that adaptive difficulties supported his claim of mental retardation. The state court understandably failed to review the omission of evidence of mental illness as a standalone claim. If that was a misapprehension of Mitchell's argument, he did nothing to correct it by way of a request for rehearing. The Court, therefore, finds that this claim was not exhausted in state court and is barred from review, except for his claim that his counsel failed to present evidence of mental retardation.

A contrary finding would not change the outcome. The Mississippi Supreme Court's opinion on this subject correctly applied the general standard for ineffectiveness, as Mitchell admits. (Reply Br. 21) He contends, however, that the court applied the law in an objectively unreasonable manner. The state court's reasoning on this issue follows:

> Mitchell argues that trial counsel should have developed and presented evidence of mental retardation during the sentencing phase of the trial. In *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002), the U.S. Supreme Court held that execution of a mentally retarded prisoner violates the prohibition on cruel and unusual punishment the Eighth Amendment. In the present case, there is no evidence in the record to suggest that Mitchell is mentally retarded within the meaning of *Atkins*. In fact, the record shows that Mitchell served four years in the military and attended college at Mississippi Valley State University for one semester. A clinical psychologist interviewed Mitchell for two hours after his arrest for murder in 1974. Dr. Donald Mathorne wrote that "it

was obvious that the patient had at least average intellectual functioning and a significant deficit in cognitive functioning was not noted during the interview." Consequently, trial counsel cannot be faulted for failing to present mitigating evidence which did not exist. This issue is without merit.

*Mitchell*, 886 So. 2d at 708-09. As will be discussed in a later section of this Opinion, this Court finds no fault with the Mississippi Supreme Court's conclusion that Mitchell failed to show that he met the standard for mental retardation defined by state law; therefore, his attorneys cannot be faulted for failing to raise it. *See Parr v. Quarterman*, 472 F.3d 245, 256 (5th Cir. 2006).

If Mitchell's current claim that his trial counsel should have offered evidence of other mental disorders were not barred, it would be reviewed under the now-familiar test for ineffectiveness under *Strickland,* which requires review of both the performance of counsel *and* whether counsel's failure to perform prejudiced the client. *Strickland v. Washington*, 466 U.S. 668 (1984). *Hill v. Lockhart*, 474 U.S. 52 (1985). Because the state court did not reach this issue, this Court's analysis, therefore, would not be "circumscribed by a state court conclusion," and its review would be de novo. *Wiggins*, 539 U.S. 510, 534 (2003). Even under that standard, this Court cannot conclude that the failure to present the evidence offered by Mitchell constituted ineffectiveness. To satisfy the *Strickland* test, a defendant must show that counsel's representation fell below an objective standard of reasonableness, and that there is "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id. (*quoting *Strickland*, 466 U.S. at 694). To satisfy the prejudice prong, the defendant must affirmatively prove, and not merely allege,

prejudice.  *Bonvillain v. Blackburn*, 780 F.2d 1248, 1253 (5th Cir.), *cert. denied*, 476 U.S. 1143 (1986).

With regard to the performance prong, the record reveals that Keith Pisarich and Thomas Musselman were Mitchell's attorneys during the sentencing hearing.  In an affidavit presented with Mitchell's habeas Petition, Pisarich states, "I was aware of Mr. Mitchell's psychiatric problems."  This awareness was likely based on the report of Dr. Henry Maggio, who conducted a competency evaluation on Mitchell prior to trial.  Dr. Maggio concluded that Mitchell did not have an Axis I or Axis II diagnosis:

> This means he does not have a mental defect of reason or a disease that would make it difficult for him to know the difference of right and wrong; he is not psychotic; he is not mentally retarded; he does not have any features of a personality disorder but it appears in 1974 and 1975 when his previous difficulties ensued and the psychologist and psychiatrist as well as the State Hospital had difficulty making a diagnosis and calling this a difficult case because he was on drugs, marijuana, speed and LSD which would produce a strange and varied clinical picture.  Today, Mr. Mitchell is completely compensated, is an intelligent man, and I am led to believe that at the time of the incident with which he is charged, he certainly knew the difference of right and wrong.  He is competent to assist counsel in his defense and to stand trial.

This report would not necessarily have alerted counsel to probe further into Mitchell's mental status, either to investigate mental retardation or mental illness.

Pisarich stated that he had no information regarding Mitchell's family background other than what he heard from the mitigation witnesses.  Thomas Musselman was the other trial counsel, and he also submitted an affidavit.  According to Musselman, no investigation was done on mitigating circumstances, and no time was set aside to prepare the family members who testified at the sentencing hearing. As will

45

be more fully set out below, Mitchell's family generally testified that he was raised by his mother and stepfather, with substantial interaction with his grandfather, who taught him to work. His mother is a retired practical nurse, and both of his siblings are college graduates. Given this information and Dr. Maggio's failure to diagnose a serious mental illness, trial counsel might not be faulted for failing to conduct further investigation into Mitchell's background. It is unnecessary to decide, however, whether that failure amounted to substandard performance, since the Court finds that Mitchell was not prejudiced.

A court considering a *Strickland* claim based upon the prejudicial effect of failure to offer potentially mitigating evidence should consider whether introduction of such evidence could have had a negative, as well as a positive, effect on the jury. *Wood v. Allen*, ___ U.S. ___, 130 S. Ct. 841, 850 n.3 (2010); *Smith v. Quarterman*, 515 F.3d 392, 404 (5th Cir. 2008); *but see Williams v. Taylor*, 529 U.S. 362, 396 (2000) (holding that counsel was not justified in failing to present "voluminous" evidence in their client's favor because it would have also informed the jury of petty juvenile offenses). Having reviewed the documents produced by Mitchell to support his ineffectiveness claim, this Court concludes that it was not of such persuasive character that it would have "influenced the jury's appraisal of his moral culpability." *Id*. (citing *Boyde v. California*, 494 U.S. 370, 387 (1990)).

The sentencing phase of Mitchell's trial was relatively brief. The State re-introduced documentary evidence of Mitchell's prior convictions and offered Dr. McGarry to discuss the manner of Milliken's death and her pain and suffering. Mitchell

46

presented four witnesses – his wife, Mary Louise Mitchell; his stepfather, Albert Reed, Jr.; his sister, Marie Dunn; and his mother, Rosemary Reed.  Mrs. Mitchell testified that her husband had a wonderful relationship with her four daughters and her grandson, whom they adopted.  According to her, Mitchell was a hard worker and a churchgoer.  Albert Reed testified that Mitchell was a "normal youngster" who was loved by everybody.  According to Reed, Mitchell was "raised up working" for his grandfather, who cut yards, although Reed thought that there was a change in Mitchell's personality after he returned from his Army service in Korea. Marie Dunn testified that both she and Mitchell's brother, Anthony, were college graduates.  Marie was an educator and Anthony was a chemist.  According to Marie, while she and Anthony were studious, "For Jerry, the best I can remember, it was going to school because it was expected of him to go to school and do okay maybe, which I think led to the choice of him, you know, taking Job Corps as a career rather than pursuing what we did."[6]  Mitchell's mother was a retired licensed practical nurse.  She described him as "[j]ust a typical boy," a former boy scout.  She testified that Mitchell dropped out of high school, but got his GED.  After he left the Army, he enrolled at Mississippi Valley State College (later, University), where his siblings had attended college.  Each of these

---

[6]At the end of her testimony, Dunn tried to explain to the jury that Mitchell's redeeming characteristics made his life worth sparing.  Her last statement on direct examination was, "A person who has committed two murders reads the Bible and that's what he does everyday."  According to Musselman, Dunn "blurted out" this testimony regarding the earlier murder because she had not been prepared for her examination.

witnesses expressed their sorrow to the Milliken family, accepted the jury's verdict on guilt, and asked for mercy on Mitchell's behalf.

Mitchell argues that his trial attorneys were ineffective because they failed to supplement this testimony with the documents later obtained by postconviction counsel. His argument relies heavily on records from the Mississippi State Hospital, where he was sent for evaluation after the 1974 murder. The professionals who examined him diagnosed him as mildly, or borderline, mentally retarded. Some of them believed, additionally, that Mitchell was schizophrenic. These records also contain details of an earlier charge of assault, resulting from an incident where he had an altercation with a woman and possibly broke her jaw and wrist. Mitchell is described in these records as "quite hostile, belligerent and very evasive." Another report relates that Mitchell and another inmate "were confined because of a disturbance that could have been quite violent proportion [sic]," and the two inmates were overheard collaborating on a possible damage suit. Mitchell's history, as described in the conference note, included two previous beatings of women, as well as the 1974 stabbing murder of a female family friend, during which her daughter was also "cut, cut, cut to pieces." The notes also reflect that, at some point during this assault, the knife that Mitchell was using broke, and he got another one. Some of the notes state that Mitchell was considered "of normal mental standard."

During this evaluation, social workers interviewed Mitchell's family members. His mother reported that, as a child, Mitchell walked and talked "about like the other children," and, although he was hyperactive, she thought that he was "one of her best

48

behaved . . . ."  In the fifth and seventh grades, Mitchell would finish his tests earlier than the other students and get in trouble by throwing paper at them.  He did like to rock and bump his head on the bars of his bed.  His brother said that Mitchell's behavior was not different from other people's except for his habit of staring out the window and being inattentive.  His grandmother said that she had become afraid of him over the last few years and had suggested that he see a physician.

Clearly, the information contained in these records was a double-edged sword, as far as Mitchell was concerned.  His trial counsel now asserts that Mitchell's sister "blurted out" that he committed two murders because she was inadequately prepared to give testimony; these reports, had they been admitted, would have described the earlier murder in detail, including the use of two knives and the fact that the other victim was "cut to pieces."  The reports also describe two earlier assaults that Mitchell committed against women.  It is the opinion of this Court that the failure to present this information to the jury was not prejudicial to the jury's consideration of mitigating factors.

Mitchell also points to his school records as demonstrating mental problems.  His elementary and high school records show that he attended school through the eleventh grade without failing a grade.  Mitchell generally made grades in the 70's, although his grades for the 6th grade were in the 80's.  He participated in football, basketball and choir.  After withdrawing in the 11th grade, Mitchell ultimately earned his GED.  In spring, 1974, he enrolled at Mississippi Valley State College, where he took biology, art, history, and psychology.  Mitchell withdrew from the school after being charged with

49

murder. Nothing in these records establishes any sort of disorder that might have persuaded jurors to impose life imprisonment, rather than the death penalty.

Records obtained from the Gulf Coast Medical Center suggest that Mitchell functions at the level of average intelligence, as is indicated in the report of the psychological evaluation of Dr. Matherne in 1974. ("It was obvious that the patient had at least average intellectual functioning and a significant deficit in cognitive functioning was not noted during the interview.") At around the same time, Dr. William Bass, a psychiatrist, also interviewed Mitchell and found him to be coherent and aware of the consequences of his actions, but believed him to be a borderline schizophrenic. This report also contains some details of the 1974 murder that would have prejudiced the jury against Mitchell.

A psychologist at the penitentiary, Dr. F. Dudley McGlynn, examined Mitchell in 1977 for purposes of classifying him upon entry into the prison system. McGlynn noted that Mitchell's crimes all involved "explosive violence" and stated that his institutional record of rules infractions did not merit consideration of Mitchell for trusty status. At that time, Mitchell's full scale IQ was measured at 83, and the results of the test suggested some organic dysfunction. McGlynn was surprised at Mitchell's performance on the academic skills test, given his college background. Mitchell read at grade level 7.9; his spelling skills were at grade level 8.7, and his math skills were at grade level. 4.9. With regard to his mental state, McGlynn believed him to be "clinically psychotic with a picture of schizophrenia, paranoid type." While this evidence would have established some mental insufficiency short of retardation, as well

as schizophrenia, it also described Mitchell as a violent, incorrigible offender, even in the prison environment, which was not the sort of evidence that a jury would likely have viewed as mitigating.

Dr. Giovanni Croce, a staff psychiatrist at the prison, interviewed Mitchell a few months later. According to him, Mitchell described his childhood as normal and happy. Mitchell only took responsibility for one of the assault charges, where he described a woman who "disrespected" him. As Croce described the situation, "[C]onsequently he became rather upset and did admit to beat [sic] her up badly and was lucky that she did not die or was killed." During his confinement, Mitchell had been involved in several disciplinary proceedings for fights with other inmates who "disrespected" him. Croce believed Mitchell to be neurologically intact, with no sign of organic brain disfunction. Nonetheless, Croce described Mitchell as "disturbed," but not presently psychotic, although with the potential to become so if he felt threatened. As with the report from Dr. McGlynn, this document would establish that Mitchell had some sort of mental disturbance, but it would also demonstrate to the jury that he was prone to extreme violence over perceived slights and continued to be a threat even after being institutionalized.

According to Mitchell, his Army records "reveal yet more evidence of a troubled individual, whose history provided ample mitigation materials . . . ." This Court disagrees. The records show that Mitchell enlisted in the Army for two years in February, 1969. In November, he was disciplined for being disrespectful to a non-commissioned officer and was reduced in rank and given extra duty and confinement.

Nevertheless, Mitchell qualified as an expert rifleman during his enlistment and earned the National Defense Service Medal. His conduct and efficiency ratings during his first enlistment were as follows: (1) 17 February 1969 - 10 April 1969: Conduct - Excellent, Efficiency - Excellent; (2) 11 April 1969 - 11 May 1969: Conduct - Excellent, Efficiency - Excellent; (3) 12 May 1969 - 15 July 1969: Conduct - Satisfactory, Efficiency - Satisfactory; and (4) 16 July 1969 - 19 April 1970: Conduct - Unknown, Efficiency - Excellent.

In January, 1970, Mitchell extended his enlistment to six years. He began this enlistment with good conduct and efficiency ratings: (1) 20 April 1970 - 21 September 1970: Conduct - Good, Efficiency - Unknown; (2) 22 September 1970 - 6 November 1970: Conduct - Fair, Efficiency - Excellent; (3) 7 November 1970 - 15 February 1971: Conduct - Excellent, Efficiency - Excellent. After this point, Mitchell began having problems, and, by September, 1971, he was disciplined for reckless driving. In December of that year, he twice missed morning formation, and he twice refused an order to drive a vehicle to another camp. In June, 1972, Mitchell was disciplined for leaving a weapon unattended in a desk drawer. In August, 1972, Mitchell was again disciplined for reckless driving and for refusing to obey orders. He fought with two other soldiers on October 25, 1972. His last three assessments in the Army found both his conduct and his efficiency to be unsatisfactory. By November, it was clear to his chain of command that he was unfit for military duty, and three different individuals assessed him to be so, as follows:

From First Sergeant William Dunham:

I, SFC William D. Dunham, [Social Security number omitted], was assigned as 1SGT for 3/1/51 from 25 Sept 71 until 18 Sept 72. From 8 May 72 until 18 Sept 72, I was in that capacity over SP4 Mitchell.

During that period of time I had numerous complaints from the Battery Supply Sergeant, SSG Rodgers, who worked directly over SP4 Mitchell and he told me that SP4 Mitchell was late reporting for work on several occasions and on several occasions he could not be found during the day. He was not doing his work properly and overall was not a competent soldier.

He had been reported to me on two occasions of misconduct in the mess hall, using profane language and being disrespectful to the Mess Sergeant, SP6 Thorn.

His overall actions, in my opinion, prove him to be unfit for further Military Duty.

From Staff Sergeant Bobbie Rodgers:

I have been assigned to the Headquarters Battery supply section since 14 Oct to present. During this time I have had numerous individuals working for me in the supply section. PVT William J. Mitchell was one of these persons and he worked for me for six months. During that time there were numerous incidents that occurred in the supply room that were caused by PVT Mitchell. One time a .45 caliber pistol was turned in and PVT Mitchell did not lock it up in the arms room. CPT Ulrich, the Battery Commander, found the pistol unattended and on 13 July 1972 he gave PVT Mitchell an Article 15 for failure to obey an order. Other times I would send PVT Mitchell on supply runs that could be done in two or three hours and he would take all day. PVT Mitchell was almost always late for work and didn't seem to care even if he got an Article 15. He got an Article 15 on 18 September because he refused to obey an order that the Mess Sergeant, SP6 Thorn gave him. He also got in trouble over his government quarters. His wife left him sometime in August and he moved into the barracks, but he kept his house and didn't mow the grass or do anything else to keep the house up or turn the quarters in so that somebody else could have them. The Brigade Housing officer finally ordered him to move out by the 11th of November. He was transferred to Battery A on the 27th of October because he was involved in a fight in the barracks on the 25th of October. PVT Mitchell has a lot of personal

problems and I gave him a lot of time off to take care of them but he would always take more time than necessary. One time he was supposed to go on sick call but went to Red Bank with a friend instead and never did go on sick call. PVT Mitchell was a daily problem for me and I couldn't depend on him because of that. I asked the 1st Sergeant to relieve him from my section on 24 October. PVT Mitchell's adaptability, attitude, initiative and responsibility are way below average. A section cannot operate and perform its mission with the type of individual that he is.

From the Executive Officer, Major Robert Orendas:

During the period 21 July 1972 to present I have had frequent occasions to observe PVT William J. Mitchell; have been witness to counseling sessions conducted by LTC Mayhew (21 July and 10 August 1972); and have counseled PVT Mitchell on 8 August and 8 November 1972 concerning his disregard for instruction, lack of motivation and general disregard towards any military authority or regulations. PVT Mitchell has been involved in frequent incidents which are of a discreditable nature with both civil and military authorities. He has received Articles [sic] 15 for failure to obey lawful orders on four separate occasions; his wife has left him due to alleged infidelity, he is currently alleged to have been involved in a barracks altercation which resulted in several persons being injured and government property being damaged. He is an arrogant individual in complete dissidence to the discipline required of members of a uniformed service and is completely incorrigible. PVT Mitchell has had several opportunities for rehabilitation as his records indicate that he has had disciplinary problems in previous units of assignment in Europe and Korea. It is my considered opinion that separation from the service UP AR 635-212 would be in the best interest of PVT Mitchell, this unit, and the United States Army.

It was ultimately recommended that Mitchell be separated from the service with a general discharge.

These records are not indicative of a troubled individual who could not adjust his skills or personality to military life despite a good faith effort. Instead, the records show that Mitchell had the capacity to be a good soldier, and was a good soldier, at the beginning of his service. After a few years, however, he apparently lost interest in his

54

military career and began to disobey orders and display general contempt for the rules of military life.  His command was not oblivious to personal problems Mitchell was having with his wife, but, when given time off to deal with those problems, Mitchell abused that privilege by absenting himself from work for long periods of time.   The content of these records simply does not support Mitchell's argument that his failure as a soldier was caused by a mental illness that the jury would view as mitigating.

The Court is aware of the Supreme Court's decision in *Porter v. McCollum*, ___ U.S. ___, 130 S. Ct. 447 (2009), where the Court held that counsel was ineffective for failing to present evidence of military service as a mitigating factor in a death penalty case.  The facts of that case are dramatically different from the situation here.  In *Porter*, the defendant had grown up in an abusive environment, where his father routinely beat his mother, once to the point of hospitalization, and even shot at the defendant once for coming home late.  130 S. Ct. at 449.  To escape the violence, Porter enlisted in the Army and fought on the front lines during the Korean War.  Porter's company commander testified on his behalf, recounting that, in one battle, his regiment was the last unit of the Eighth Army allowed to withdraw from the Chinese attack, after hand to hand fighting.  *Id*. at 450.  Another battle resulted in his unit's being cut off, and his company was ordered to charge up a hill under enemy fire, losing half of its men. *Id.*  Porter received two Purple Hearts, and his unit was awarded the Presidential Unit Citation for its efforts.  There was also evidence that Porter had nightmares about his war experiences and would attempt to climb his bedroom walls at night with knives.  He developed a serious drinking problem.

The lower court discounted the effect of this evidence on the jury, on grounds that there was also evidence that Porter had gone AWOL twice while in Korea and again after his return home.  The Supreme Court disagreed, stating:

> Our Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines as Porter did.  Moreover, the relevance of Porter's extensive combat experience is not only that he served honorably under extreme hardship and gruesome conditions, but also that the jury might find mitigating the intense stress and mental and emotional toll that combat took on Porter.  The evidence that he was AWOL is consistent with this theory of mitigation and does not impeach or diminish the evidence of his service.  To conclude otherwise reflects a failure to engage with what Porter actually went through in Korea.  (Footnote omitted)

130 S. Ct. at 455.  Adding to the prejudice of failing to present this evidence in Porter's case was the jury's failure to find some of the aggravating circumstances pressed by the prosecution, as well as the reversal of the finding that the murder was especially heinous, atrocious or cruel.  *Id*. at 454.  Thus, consideration of this mitigating evidence might well have changed the outcome of Porter's case.  The nature of Porter's military service, however, is vastly different from Mitchell's experience, which did not include combat.  This Court is of the opinion that Mitchell's military records did not contain information that would have benefitted his mitigation case, and he did not suffer any prejudice by their exclusion.

With regard to his post-Army work experience, the records provided from Ingalls Shipyard show that he was interviewed in April, 1973, where he was described as having a "good attitude" and being a "good prospect."  By June, however, he received a Disciplinary Action Notice for leaving his job and going to the lunch trailer before lunch

time. He received another Notice in July for excessive lost time. Mitchell quit in September, saying that he had been promised a transfer to welding. There was no attempt to keep him at the company because he had a bad absentee record. An appraisal of his performance as a direct care worker at the Mississippi State Hospital in 1989 indicated that he performed successfully in a variety of categories related to patient care, although his work attendance later declined and he was terminated. Mitchell worked for J. B. Hunt for a short period of time in 1990, but he was discharged. As with his military records, the Court finds that Mitchell's employment records do not paint a sympathetic picture, and presenting them to the jury would not have helped his case.

In connection with his post-conviction proceedings, Mitchell submitted an affidavit from Dr. Criss Lott, a psychologist who has recently reviewed his records. Lott believes that a thorough forensic psychological evaluation, including neuropsychological and intelligence testing, should be performed on Mitchell "to explain the factors in [his] life that led to his involvement in the crimes." With his habeas petition, Mitchell presented an affidavit from Dr. Sarah DeLand, a psychiatrist. Dr. DeLand has also reviewed Mitchell's records, and she, too, believes that further testing might reveal the existence of a neurological dysfunction. However, nothing in either affidavit offers a diagnosis, and the belief of Dr. Lott and Dr. DeLand that further testing should occur does not establish that Mitchell had any mental or intellectual deficiency that would have caused any juror to change his mind about imposing the death penalty.

Clearly, post-conviction and habeas counsel have worked diligently on Mitchell's behalf to accumulate the voluminous records that have been presented to establish the existence of mitigation evidence that was not presented at his trial. However, this evidence does not raise the question of culpability as starkly as that set out in the Supreme Court's decisions in *Williams v. Taylor*, 529 U.S. 362 (2000) and *Wiggins v. Smith*, 539 U.S. 510 (2003). In *Williams*, defense counsel failed to investigate the defendant's childhood, on the mistaken grounds that he could only do so by obtaining records that he thought were barred from access by state law. By failing to investigate, counsel neither obtained nor presented evidence showing that the defendant's childhood was "filled with abuse and privation" and that he was borderline mentally retarded. 529 U. S. at 398. Finding that this evidence could reasonably have affected the jury's decision to impose the death penalty, the Court reversed and remanded the case.

In *Wiggins*, although counsel told the jury at the beginning of the mitigation phase that they would hear evidence on Wiggins's difficult life, they instead focused on their claim that Wiggins's life should be spared because he was not directly responsible for the murder. In so doing, the attorneys failed to present to the jury the following evidence, given at a post-conviction hearing by a licensed social worker:

> According to Selvog's report, petitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage. [References to the record omitted throughout] Mrs. Wiggins's abusive behavior included beating the children for breaking into the kitchen, which she often kept locked. She had sex with men while her children slept in the same bed and, on one occasion, forced petitioner's hand against a hot stove burner- an incident that led to petitioner's hospitalization. At the age of six, the State placed Wiggins in foster care. Petitioner's first and second foster

mothers abused him physically, and, as petitioner explained to Selvog, the father in his second foster home repeatedly molested and raped him. At age 16, petitioner ran away from his foster home and began living on the streets. He returned intermittently to additional foster homes, including one in which the foster mother's sons allegedly gang-raped him on more than one occasion. After leaving the foster care system, Wiggins entered a Job Corps program and was allegedly sexually abused by his supervisor.

*Id.* at 516-17. The Supreme Court analyzed the case under *Strickland*, finding both deficient performance and prejudice. Given the strength of the evidence omitted, the Court found that the failure to present it to the jury could not be defended as a strategic decision, but was simply deficient performance. 539 U.S. at 535. The Court further found that the failure to present the evidence prejudiced Wiggins, stating, "Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Id.* at 537. *See also Rompilla v. Beard*, 545 U. S. 374, 391-92 (2005) (holding failure to review file from prior conviction prevented the jury from considering an evaluation by a corrections officer who related a troubled childhood that included being locked in a mesh dog pen full of excrement, as well as alcohol abuse and an indication of schizophrenia, was ineffective).

Although the evidence produced during Mitchell's collateral proceedings is extensive, the quality of the evidence must be reviewed in conjunction with its quantity to determine whether he was prejudiced in the sentencing proceedings by its unavailability to the jury. *Blanton v. Quarterman*, 543 F.3d 230, 236 (5th Cir. 2008). The quality of the evidence produced simply does not support Mitchell's argument that reasonable jurors would have found it to be mitigating. This Court concludes that he

was not prejudiced by its omission. For this reason, counsel cannot be faulted for failing to present it to the jury, and Mitchell is not entitled to habeas relief on this issue.

**E.**     **Petitioner's Eighth and Fourteenth Amendment rights were violated when the trial court erred by permitting the "avoiding or preventing a lawful arrest or effecting an escape from custody" aggravating factor to be presented to the jury without sufficient evidentiary support.**

Mitchell's argument on this issue is two-fold: first, he attacks the sufficiency of the evidence used to support the finding of this aggravating circumstance, and, second, he asserts that the aggravating circumstance itself was defined in the instruction given to the jury in a manner that was unconstitutionally vague. Respondents counter that the second claim is barred from review as not having been raised in state court. Mitchell responds that Respondents misconstrued his argument, which was not that the aggravator itself is unconstitutional, only the manner in which it was given to the jury.

The aggravating circumstance is codified at Miss. Code Ann. § 99-19-101(5)(e), which states, "The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." The instruction given to the jury on this aggravator quoted that language, and Mitchell's trial counsel objected to the instruction only on grounds "that there's nothing in the record to support that." There is no indication that defense counsel offered any limiting or alternative instruction on this issue.

In his argument, the prosecutor stated:

Whether the capital offense was committed for the purpose of avoiding or preventing lawful arrest, for effecting an escape from custody. He was on parole, he hit her, he snapped, what did he do? She was stunned. What

did he do?  Dropped her off, did he apologize, hope for the best?  He took
her under the bridge and he ran over her until she died.

On appeal, Mitchell argued only that the evidence did not support the instruction,

without referring to either federal case law or a constitutional provision.    The

Mississippi Supreme Court's affirmance on this issue did not reference federal law, as

its decision was based solely on the quantum of evidence that could have supported this

aggravator, holding:

> [T]here is sufficient evidence in the record to show that Mitchell murdered
> Milliken in an attempt to cover up evidence that he had inflicted the
> injuries she had received by his hand, all in the hope of avoiding arrest.
> Prior to her skull being crushed under the weight of Mitchell's vehicle,
> Milliken was the recipient of a beating, strangulation and sexual assault.
> According to Mitchell, some of these initial injuries were caused while they
> were in a mall parking lot.  She was then taken to a different location
> where she was injured further, repeatedly run over, and then finally
> murdered.  It is reasonable to conclude that Mitchell's act of repeatedly
> crushing and mangling her was done in the hope of covering up the
> injuries he had administered earlier.  Mitchell also took her under a
> bridge in order to run over her.
>
> The surveillance tape from the convenience store shows that
> Milliken was fully clothed when she left work that evening.  When her
> body was discovered she was almost completely unclothed, lending further
> to a reasonable belief that Mitchell had discarded most of her clothing and
> shoes in the hope of covering his tracks.  These facts clearly demonstrate
> that there was sufficient evidence that the murder was committed in an
> effort to avoid lawful arrest.  As such, this issue is without merit.

*Mitchell*, 792 So. 2d at 219-20.  In his post-conviction petition, Mitchell raised this claim

again, but under the auspices of the Sixth Amendment, claiming his trial counsel was

ineffective for failing to  challenge the factual basis for this aggravator.  *Mitchell*, 886

So. 2d at 709.  The Mississippi Supreme Court reviewed its earlier decision on the

merits of this claim and characterized the challenge as an attempt to "recast the same issue as ineffective assistance of counsel." *Id*. Thus, it denied relief.

Generally, the federal court's role in reviewing a state court's finding of an aggravating circumstance is primarily a review of whether the aggravator itself is constitutionally defined. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Barclay v. Florida*, 463 U.S. 939, 947 (1983) ("Our review of these findings [on aggravating circumstances] is limited to the question whether they are so unprincipled or arbitrary as to somehow violate the United States Constitution . . . .") Mitchell cannot obtain habeas relief on this issue because Mississippi's construction of this aggravating circumstance has kept it within constitutional boundaries. *Gray v. Lucas*, 677 F.2d 1086, 1110 (5th Cir. 1982); *Evans v. Thigpen*, 631 F. Supp. 274, 283 (S.D. Miss. 1986); *Wiley v. Epps*, No. 2:00cv130PA, 2009 WL 3747196 at *6-8 (N.D. Miss. Nov. 5, 2009). That being the case, Mitchell's argument is reduced to the claim that he made initially to the Mississippi Supreme Court – that the evidence was insufficient to satisfy the jury's finding on this aggravator. That review is conducted under the familiar rationale of *Jackson v. Virginia*, 443 U.S. 307 (1979). The relevant question is, "[W]hether, after viewing the evidence and the reasonable inferences which flow therefrom in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 324. As the United States Supreme Court has explained, "Federal Courts are not forums in which to relitigate state trials." *Autry v. Estelle*, 464 U.S. 1, 3 (1983).

Mississippi has construed this aggravating circumstance "to refer to purposefully killing the victim of an underlying felony to avoid or prevent arrest for that felony." *Gray*, 677 F.2d at 1109-10. The evidence must be sufficient for the jury to "reasonably infer that concealing the killer's identity, or covering the killer's tracks to avoid apprehension and arrest, was a substantial reason for the killing." *Hansen v. State*, 592 So. 2d 114, 153 (Miss. 1991) (citing *Leatherwood v. State*, 435 So. 2d 645, 651 (Miss. 1983)). The evidence relied on by the Mississippi Supreme Court was quoted earlier; however, Mitchell attempts to cast doubt upon its validity because he contends that the prosecutor argued a different theory to the jury – that Milliken's injuries were the result of rage. This Court reads the prosecutor's argument differently. After recognizing the initial assault on Milliken, which, apparently, Mitchell admitted. he stated, "What did he do? Dropped her off, did he apologize, hope for the best? He took her under the bridge and he ran over her until she died." Thus, while not emphasizing every fact relied on by the Mississippi Supreme Court as supporting this aggravating circumstance, the prosecution's argument did infer that Mitchell took Milliken to an area where he was not likely to be seen in order to finally dispose of her.

Other cases have found the existence of this aggravator on far fewer facts. *See, e.g., Ross v. State*, 954 So. 2d 968, 1010 (Miss. 2007) ("Because Ross knew Yancey personally, it was reasonable for a jury to conclude that Yancey was murdered to conceal either the identity of the killer or to avoid investigation for the robbery."); *Thorson v. State*, 895 So. 2d 85, 99 (Miss. 2004) (holding that aggravator existed where, after raping his victim, the defendant wiped down the car, asked the victim whether she

would tell anyone what happened, decided that he did not believe her and killed her); *Chase v. State*, 645 So. 2d 829, 857 (Miss. 1994) (holding that aggravator existed where defendant used gloves, parked his vehicle in a wooded area about 200 yards from the victim's home, refused to get out of his car at a service station because he had blood on his clothes, and later threw his clothes away).

The *Jackson* analysis focuses on the sufficiency of the evidence, not the prosecution's argument; therefore, the prosecution does not have to argue every piece of evidence in closing in order to support the jury's verdict. Instead, the State only had to present sufficient evidence for the jury to determine that Mitchell killed Milliken for the purpose of and in a manner designed to avoid arrest. The evidence presented at trial showed that Milliken was acquainted with Mitchell, and, apparently, she left the store voluntarily in his company. At some point thereafter, Mitchell, a convicted felon on parole, assaulted Milliken. After doing so, he drove her to a secluded location and killed her. Those facts are sufficient for a reasonable factfinder to conclude that Mitchell killed Milliken in order to avoid arrest for the earlier assault.

Even if this aggravator had been improperly found by the jury, invalidating it would not change the result here, where the jury also found three other aggravators – that Mitchell was under a sentence of life imprisonment when the crime was committed, that he had been convicted of another felony involving the use of violence, and that the murder was especially heinous, atrocious or cruel. Thus, the jury found four aggravating circumstances that it weighed against the mitigating circumstances to return a verdict

of death. Invalidating one of those aggravators does not, necessarily, invalidate the verdict.

Formerly, United States Supreme Court precedent distinguished between "weighing" and "non-weighing" states to determine the effect of an invalid aggravator. Weighing states, such as Mississippi, instruct the jury that, if it finds at least one aggravating factor, it must then weigh the aggravating factors against the mitigating circumstances to determine whether death is the appropriate sentence. *Stringer v. Black*, 503 U.S. 222, 229 (1992). In a non-weighing state, an aggravating factor must be found before the jury can consider imposing death, but the jury is simply told to consider both aggravating and mitigating circumstances. *Id.* at 229-30. In non-weighing states, harmless error analysis was not needed, and invalidation of an aggravating circumstance did not usually mandate reversal or remand, so long as at least one aggravator remained. *Stringer; Zant v. Stephens*, 462 U.S. 862, 890 (1983).

Where an aggravating circumstance was held to be invalid in a weighing state, however, prior law required that the remaining aggravators be re-weighed against the mitigating evidence. *Clemons v. Mississippi*, 494 U.S. 738, 745 (1990). That re-weighing could be done by either the trial court or an appellate court *of the state*. Federal courts cannot not re-weigh the factors. *Richmond v. Lewis*, 506 U.S. 40, 49 (1992) ("Where the death sentence has been infected by a vague or otherwise constitutionally invalid aggravating factor, the state appellate court or some other state sentencer must actually perform a new sentencing calculus, if the sentence is to stand.") As an alternative to re-weighing, the state court can also perform a harmless error

analysis. *Clemons*, 494 U.S. at 753-54. However, while never expressly addressed by the Supreme Court, several of the Circuits have held that federal courts may also conduct a harmless error analysis, even where the state court did not. *Jennings v. McDonough*, 490 F.3d 1230, 1252 (11th Cir. 2007) ("By our count, five circuit courts of appeals have authorized such an approach.") The Fifth Circuit is among them. *Nixon v. Epps*, 405 F.3d 318, 331-32 (5th Cir. 2005); *Billiot v. Puckett*, 135 F.3d 311, 319 (5th Cir. 1998).

The law changed in 2006, when the Supreme Court decided *Brown v. Sanders*, 546 U.S. 212 (2006). In *Brown* the Court reviewed the partial grant of habeas relief in a case from California, a non-weighing state. The Court discussed the history of its distinction between weighing and non-weighing states – terminology that it admitted was "misleading." *Id*. at 216. All states require some form of "weighing," and the existing law did not distinguish between the treatment accorded to a case where an "eligibility" factor rather than an "aggravating" factor was invalidated.[7] Finding that

---

[7]For purposes of its analysis, the Court referred to "eligibility" factors as those making a murder defendant eligible for the death penalty. In Mississippi, the eligibility factors are contained in the statute defining capital murder, Miss. Code Ann. § 97-3-19(2) (1972), and include murder of a law enforcement officer or elected official, murder at a school, murder by a person already under a life sentence, murder by explosive device, murder for hire, murder in the commission of child abuse, and murder in the commission of certain other crimes. Aggravating factors are those considered by the sentencer to determine which eligible murder defendants will actually receive a death sentence. In Mississippi, aggravating circumstances are found in § 99-19-101 and include, in addition to the one at issue here, murder committed by a person already under a sentence of imprisonment or previously convicted of a crime of violence, committed while in commission of the crimes listed in the eligibility statute, as well as aircraft piracy, committed to avoid an arrest or to effect an escape, committed for pecuniary gain, committed to disrupt or hinder the exercise or

the scheme was "needlessly complex and incapable of providing for the full range of possible variations," the Court determined that the difference in treatment was unnecessary, stating:

> We think it will clarify the analysis, and simply the sentence-invalidating factors we have hitherto applied to non-weighing States . . . . if we are henceforth guided by the following rule: An invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances.

*Id.* at 220. The Court went on to explain that the test was not based on the *admissibility* of the underlying evidence, but whether the evidence could have been given aggravated weight under a valid sentencing factor. *Id.* at 220-21.

Courts and commentators disagree on *Brown's* actual meaning and effect – particularly whether it leaves intact the *Stringer* requirement of re-weighing in jurisdictions such as Mississippi. Some commentators believe that *Brown* provides a sort of harmless error test for non-weighing states, in which that analysis was not previously performed, but that the opinion has no effect in weighing states. Others believe that *Brown* sets forth a new preliminary test for weighing states, to be performed prior to harmless error analysis. The Fifth Circuit has not had occasion to consider *Brown* and its effect on Mississippi law. It has, however, cited *Brown* to deny

---

enforcement of law, or was an offense that was especially heinous, atrocious or cruel. Both types are included in *Brown's* use of the term "sentencing factors," and either set of factors – eligibility or aggravating – performs the narrowing function required by *Furman v. Georgia*, 408 U.S. 238 (1972).

habeas relief in a case from Texas, where evidence of an overturned prior conviction was improperly admitted, but the same evidence supported a valid conviction. *Hughes v. Quarterman*, 530 F. 3d 336, 356 (5th Cir. 2008).

Clearly, if the Mississippi Supreme Court had invalidated the aggravator and then failed to remand the case or re-weigh the factors itself, the applicable law would be *Stringer*, since *Brown* was not clearly established federal precedent at the time. Here, however, the state court refused to invalidate the aggravator. The question is whether this Court must grant habeas relief, if inclusion of the aggravator was not harmless. *Stringer* and *Clemons* would hold that relief must be granted, and a state court must re-weigh the aggravating and mitigating circumstances. *Brown* seems to hold that it is not necessary for the federal court to grant habeas relief, if it determines that the evidentiary basis for the aggravator could be used to support another aggravating circumstance. This Court must determine whether *Brown* applies in cases from weighing states and whether *Brown* has any effect on this Court's ability to perform harmless error analysis. It is this Court's opinion that, given the language of *Brown* announcing that it was eliminating the dichotomy between weighing and non-weighing states, the Supreme Court intended that *Brown*'s rationale apply to both. Thus, Mitchell's case should be analyzed under *Brown*.

Under *Brown's* rationale, the Court must determine whether evidence submitted to support an invalid aggravator could have been considered in support of one of the other aggravating circumstance found by the jury. The evidence offered in support of the "avoiding arrest" aggravator was the location of Milliken's body and the injuries

inflicted on her. This evidence was also relevant to the "heinous, atrocious and cruel" aggravator, which has not been challenged by Mitchell. Thus, under *Brown*, constitutional error was not committed by considering the evidence that supported the heinous, atrocious and cruel aggravator, and use of that evidence to also support the "avoiding arrest" aggravator was not unconstitutional.

The Court is of the opinion that presenting the "avoiding arrest" aggravator as a option to the jury was not error, as the evidence supported it. The Mississippi Supreme Court's opinion on this issue was not an unreasonable application of, or contrary to, clearly established federal law. Even if the aggravator was erroneously argued and found, the error did not offend the Constitution, since the evidence offered in support was also relevant to a valid aggravating circumstance. For these reasons, Mitchell is not entitled to habeas relief on this issue.

**F.  The aggravating factors elevating the charge to a capital offense were not included in Petitioner's indictment, and, therefore, Petitioner's death sentence must be vacated.**

Mitchell argues that the aggravating circumstances on which the State intended to rely were not listed in his indictment, in violation of *Ring v. Arizona*, 536 U.S. 584 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). This argument was considered on post-conviction, and the Mississippi Supreme Court rejected it. *Mitchell v. State*, 886 So. 2d 704, 710-11. In so doing, that court recognized *Apprendi's* holding – that aggravating circumstances on which a federal prosecutor intends to rely must be listed in an indictment. 886 So. 2d at 710 (citing *Apprendi*, 530 U.S. at 490). The court also correctly stated the holding in *Ring* – that any aggravating circumstance used to justify

69

the death penalty is equivalent to a finding of a greater offense, and must be found by a jury. *Id.* (citing *Ring*, 536 U.S. at 609). However, the petitioner in *Ring* did not attack the constitutionality of his indictment, and the Supreme Court referred to the claim that he **did** make – that the Sixth Amendment required the jury to find any aggravating factors – as "tightly delineated." *Id.* at 597.

The holding in *Ring* cannot be extended to invalidate a state court indictment because it did not list all of the aggravating circumstances that the state intended to prove at trial. Such an extension would not help Mitchell in any event, since his conviction became final after *Ring* was decided. A conviction becomes final for retroactivity analysis when the direct appeal to the state court is concluded and the time for petitioning for certiorari has expired or a timely petition for certiorari has been denied. *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994). In Mitchell's case, the Supreme Court denied his petition for writ of certiorari on direct appeal on March 18, 2002. *Mitchell v. Mississippi*, 535 U.S. 933 (2002). *Ring* was decided on June 24, 2002, so it could only help Mitchell if its holding could be applied retroactively; however, its holding has been held to be procedural and not to be applied retroactively. *Schriro v. Summerlin*, 542 U.S. 348 (2004).

Due process requires that a defendant be informed of the charges brought against him by the state. *Cole v. Arkansas*, 333 U.S. 196, 201 (1948). However, there is no clearly established federal law that requires that each aggravating circumstance on which the state intends to rely to pursue the death penalty must be named in the indictment. The Mississippi Supreme Court recognized this and held, based on state

law, that the indictment was sufficient. Mitchell has not shown that the Mississippi Supreme Court's decision is contrary to or an unreasonable application of clearly established federal law because there has been no case from the United States Supreme Court that suggests otherwise. *See Brawner v. Epps*, No. 2:07cv16MPM, 2010 WL 383734 at *22 (N.D. Miss. 2010); *Simpson v. Quarterman*, No. 1:04-CV-485, 2007 WL 1008193 at *21 (E.D. Tex. Mar. 29, 2007) ("Neither *Apprendi* nor *Ring* held that aggravating factors in a state capital case must be pleaded in the indictment.") Therefore, Mitchell's argument here has no merit.

**G.  Petitioner's Fourth, Fifth and Fourteenth Amendment rights were violated as a consequence of law enforcement's illegal, warrantless entry onto private residential property, ultimately leading to petitioner's arrest and the seizure of incriminating evidence.**

This claim involves the actions of Officer McKaig, who was headed to the back of Mitchell's grandfather's house when he encountered Mitchell. At the pretrial suppression hearing, McKaig testified that he was "coming around the side of the house" when he first spotted Mitchell. At trial, he testified that he entered the back yard. By that time, Milliken was missing, having been last seen in Mitchell's company, and her body had not been found. On appeal, Mitchell argued that this action was a trespass and also the reason that he fled from police. Because the seizure of evidence from his person and his car was the direct result of that trespass, Mitchell claimed that the evidence should be suppressed.

The Mississippi Supreme Court described the circumstances surrounding the "trespass" as follows:

> [I]n the instant case the police were under the belief that Mitchell was the last person who had seen Milliken and were aware that she had disappeared under curious circumstances. Also the police in the present case did not gather evidence from Mitchell's car or clothing while on the premises to ask him questions. Only after other information was amassed through questioning of Mitchell and the discovery of Milliken's body, did the police obtain search warrants for Mitchell's body and vehicle.

*Mitchell*, 792 So. 2d at 205-06. Citing *California v. Rooney*, 483 U.S. 307, 324 (1987),[8] the state court held that the officers' entry onto the property did not constitute a "search" because the officers were in "an area of common use," either at the front door or near the driveway. *Mitchell*, 792 So. 2d at 206.

Mitchell cites to several United States Supreme Court cases to establish that the Mississippi Supreme Court unreasonably applied clearly established federal law to this issue. The Court has reviewed each of these cases, and none condemns a police entry onto private property to question a suspect. *See Kyllo v. United States*, 533 U.S. 27, 40 (2001) (holding Fourth Amendment violated by use of thermal imaging equipment to gather information from within residence); *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996) (holding no Fourth Amendment violation where subject was stopped for a traffic violation and later gave consent to a search of his automobile); *Ornelas v. United States*, 517 U.S. 690 699-700 (1996) (holding, with reference to a search of an automobile, that determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal); *Florida v. Jimeno*, 500 U.S. 248, 251-52 (1991) (holding Fourth Amendment not violated where, after being given consent to search an automobile, officer opened

---

[8]This citation is actually to the dissenting opinion of a *per curiam* decision.

container that he believed contained subject of search); *Illinois v. Rodriguez*, 497 U.S. 177, 186-89 (1990) (holding that consent to search premises is invalid if given by one who does not have common authority with defendant); *Minnesota v. Olson*, 495 U.S. 91, 100-101 (1990) (warrantless entry into home and arrest of overnight guest violated Fourth Amendment); *Florida v. Riley*, 488 U.S. 445, 451-52 (1989) (holding surveillance of greenhouse from helicopter was not a search, and, therefore, not a violation of the Fourth Amendment); *California v. Greenwood*, 486 U.S. 35, 40-42 (1988) (Fourth Amendment not violated by warrantless search of garbage left outside curtilage of home); *Arizona v. Hicks*, 480 U.S. 321, 327-29 (1987) (holding that, during a valid warrantless entry of a residence, the Fourth Amendment permitted officers to note what was in plain view, but prohibited seizure of any items unless there was probable cause to suspect items were evidence of a crime); *Dow Chemical Co. v. United States*, 476 U.S. 227, 237-39 (1986) (holding that warrantless photographic surveillance of corporate site was not a search and, therefore, did not violate the Fourth Amendment); *California v. Ciraolo*, 476 U.S. 207, 213-15 (1986) (holding that warrantless aerial observation of backyard from publicly navigable air space did not violate the Fourth Amendment); *United States v. Karo*, 468 U.S. 705, 719-21 (1984) (holding Fourth Amendment violated by warrantless installation of monitoring device in a container, where information obtained could not have been gathered through visual surveillance); *Oliver v. United States*, 466 U.S. 170, 181-84 (1984) (holding Fourth Amendment not violated by search of an open field) ; *United States v. Jacobsen*, 466 U.S. 109, 111-13 (1984) (holding Fourth Amendment not violated where DEA agents seized and tested powder in packages that had been damaged in

shipping); *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (holding test for existence of probable cause depends on the totality of the circumstances); *United States v. Cortez*, 449 U.S. 411, 417-22 (1981) (holding Fourth Amendment not violated by investigatory stop of vehicle, where officers could reasonably surmise that vehicle was involved in smuggling aliens across the border); *Rawlings v. Kentucky*, 448 U.S. 98, 104-11 (1980) (holding that Fourth Amendment was not violated by search of a companion's purse or a search incident to an arrest); *Walter v. United States*, 447 U.S. 649, 652 (1980) (holding that Fourth Amendment was violated where boxes of pornographic tapes were seized and opened after being mistakenly delivered to a third party); *Payton v. New York*, 445 U.S. 573, 589-91 (1980) (holding warrantless entry into home to effect an arrest violates the Fourth Amendment, even when probable cause exists, absent exigent circumstances); *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) (holding third party did not have standing to contest search of an automobile); *Michigan v. Tyler*, 436 U.S. 499, 508-11 (1978) (holding that Fourth Amendment permitted firefighters to remain in building after fire is extinguished to determine its source, but a warrant was required for future visits); *United States v. Martinez-Fuerte*, 428 U.S. 543, 561-62(1976) (Fourth Amendment not violated by border officials' stopping cars at fixed checkpoints to question occupants); *Brown v. Illinois*, 422 U.S. 590, 601-03 (1975) (holding that administration of Miranda warnings after an arrest without probable cause did not cure Fourth Amendment violation); *United States v. Matlock*, 419 U.S. 164, 172-77 (1974) (holding that hearsay evidence could establish that consent was given by co-occupant of premises); *Cupp v. Murphy*, 412 U.S. 291, 294-95 (1973) (holding Fourth Amendment not

violated where police detained and took fingernail scrapings from suspect who voluntarily appeared at station where police had probable cause to suspect him of murder); *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973) (holding that search of a subject not in custody did not violate the Fourth Amendment if the subject gave voluntary consent); *Coolidge v. New Hampshire*, 403 U.S. 443, 449 (1971) (Fourth Amendment violated when automobile was searched pursuant to a warrant that had not been issued by a neutral magistrate); *Frazier v. Cupp*, 394 U.S. 731, 740 (1969) (holding no Fourth Amendment violation where clothing was seized from a bag whose joint user gave consent); *Terry v. Ohio*, 392 U.S. 1, 27-28 (1968) (finding no Fourth Amendment violation in "stop and frisk," where officer had reasonable concern for his safety); *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) (holding Fourth Amendment violated where owner of the house did not consent to a search, but was falsely informed that police had a warrant); *Katz v. United States*, 389 U.S. 347, 353-58 (1967) (holding that the warrantless interception of telephone communications violated the Fourth Amendment); *Warden v. Hayden*, 387 U.S. 294, 309-10 (1967) (holding officers who entered a house without a warrant under exigent circumstances could seize evidence other than contraband); *Schmerber v. California*, 384 U.S. 757, 771 (1966) (holding that the Fourth Amendment did not prohibit taking blood samples involuntarily, when taken incident to an arrest); *United States v. Ventresca*, 380 U.S. 102, 111-12 (1965) (holding that probable cause existed for issuance of search warrant where raw material for illegal distillery was observed being delivered to the subject property); *Wong Sun v. United States*, 371 U.S. 471, 480-81 (1963) (holding that use of statement procured by officers

after entering suspect's home without probable cause violated Fourth Amendment); *Jones v. United States*, 357 U.S. 493, 499-500 (1958) (holding that the Fourth Amendment was violated where federal agents in possession of a daytime search warrant executed the warrant after nightfall, and probable cause did not excuse the entry into the suspect's home to conduct a search); *Wolf v. Colorado*, 338 U.S. 25, 30 (1949) (holding that the Fourth Amendment applied to states, but the federal exclusionary rule did not), *overruled by Mapp v. Ohio*, 367 U.S. 643, 654 (1961); *Johnson v. United States*, 333 U.S. 10, 13 (1948) (holding warrantless entry and search of hotel room was not justified by officers' smelling burning opium in hallway); *Nardone v. United States*, 308 U.S. 338, 340-41 (1939) (holding the Fourth Amendment prohibited the indirect use of improperly acquired evidence); *Carroll v. United States*, 267 U.S. 132, 149 (1925) (holding that search and seizure of contraband in an automobile did not violate Fourth Amendment, where there was probable cause to believe the contraband was there); *North American Cold Storage Co. v. Chicago*, 211 U.S. 306, 319-20 (1908) (upholding ordinance providing for summary seizure and disposition of food unfit for human consumption); *Boyd v. United States*, 116 U.S. 616, 638 (1886) (Fourth Amendment violated by law that compelled production of documents, thus permitting a warrantless seizure of personal papers), *abrogated by Katz v. United States*, 389 U.S. 347, 353-58 (1967).

None of the cases cited above constitutes clearly established federal law that should be applied to Mitchell's case, either directly or by reasonable extension. Of all of the cases cited by Mitchell, the fact situation closest to his case is described in *United*

*States v. Santana*, 427 U.S. 38 (1976). There, officers were informed that the defendant had marked money given to her after a drug sale. Having probable cause to do so, officers went to her home to arrest her. *Id.* at 42. Santana was standing in the doorway to her home when police arrived, but she retreated into the house, pursued by officers. When they caught Santana, both money and drugs fell to the floor and were seized. The Court first held that Santana was not in a private place, noting, "While it may be true that under the common law of property the threshold of one's dwelling is 'private,' as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment Santana was in a 'public' place." *Id.* Because probable cause would have justified a warrantless arrest in a public place, the Court held that her act of retreating into her home, where a warrant would ordinarily be required to arrest her, could not thwart an otherwise lawful act. *Id.* at 42-43.

*Santana* indicated that an entry that might be considered a trespass at common law does not always constitute a violation under the Fourth Amendment. A later Supreme Court case confirmed that is a difference between a "search" and a trespass at common law. *Oliver*, 466 U.S. at 183-84, n15. ("[I]t does not follow that the right to exclude conferred by trespass law embodies a privacy interest also protected by the Fourth Amendment.") Lower courts have long recognized that police may lawfully go to a person's home to interview him where they have reasonable suspicion that he is involved in illegal activities. *United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir. 1991); *United States v. Merritt*, 736 F.2d 223, 232 (5th Cir. 1984); *United States v. Knight*, 451 F.2d 275, 278 (5th Cir. 1971) ("When the performance of his duty requires

an officer to enter upon private property, his conduct, otherwise a trespass, is justifiable."). This is so even if the officer must enter the rear area of the property. *Nail v. Gutierrez*, 339 F. App'x 630, 632 (7th Cir. 2009); *United States v. Daoust*, 916 F.2d 757, 758 (1st Cir. 1990); *United States v. Anderson*, 552 F.2d 1296, 1300 (8th Cir. 1977); *United States v. Bradshaw*, 490 F.2d 1097, 1100 (4th Cir. 1974); *Knight*, 451 F.2d at 278.

Mitchell's claim that McKaig trespassed onto his grandfather's property, thus vitiating all police activity that occurred thereafter, is not cognizable under clearly established federal law. The Mississippi Supreme Court found that the entry onto his grandfather's property was not a search, because the officers were in an area of common use. Clearly established federal law distinguishes between a trespass at common law and an entry for Fourth Amendment purposes. The law further establishes that police may enter onto property for the lawful purpose of questioning a suspect to a crime. Finding that the police were on the property for a lawful purpose – to question a suspect in Milliken's disappearance – the state court found that the police did not exceed that purpose and there was no constitutional violation. Mitchell has not shown, and this Court does not find, that the Mississippi Supreme Court's opinion on this issue was contrary to, or involved an unreasonable application of, clearly established federal law. For this reason, he cannot obtain habeas relief on this issue.

**H.      The Petitioner is mentally retarded as contemplated in the United States Supreme Court case of *Atkins v. Virginia* and the Eighth Amendment forbids execution of the mentally retarded.**

Mitchell argues that the death penalty would be a disproportionate punishment for him because mental retardation has reduced his culpability for the murder, within

the meaning of *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). This is also a partial basis for his contention that his attorneys were ineffective, as discussed earlier in this Opinion. As a basis for this claim, Mitchell argued to the Mississippi Supreme Court that early test scores placed him within the generally accepted range of mild mental retardation and that later scores supported that conclusion. He also argued that later behavioral observations demonstrated that he had deficiencies in adaptive functioning.

Specifically, Mitchell argued that school records showed that he was a very poor student, achieving IQ scores of 71, 74, 76 and 65. After he joined the military, his record showed that he had difficulty adapting to the rules of military service, resulting in his discharge for unsuitability. A later report from the Mississippi State Hospital, dated February 11, 1975, showed that he was diagnosed as suffering from mild mental retardation, and other reports showed poor academic schools. Additionally, his medical, military and employment records showed that he had poor adaptive skills. The Mississippi Supreme Court disagreed with Mitchell's claim, as follows:

> In the present case, there is no evidence in the record to suggest that Mitchell is mentally retarded within the meaning of *Atkins v. Virginia*. In fact, the records show that Mitchell served four years in the military and attended college at Mississippi Valley State University for one semester. A clinical psychologist interviewed Mitchell for two hours after his arrest for murder in 1974. Dr. Donald Mathorne wrote that "it was obvious that the patient had at least average intellectual functioning and a significant deficit in cognitive functioning was not noted during the interview."

> Further, this Court recently held in *Chase v. State*, 873 So. 2d 1013 (Miss. 2004), that defendants with an IQ of 76 or above are not entitled to protection under *Atkins*. The Court held that it was incumbent upon a petitioner claiming mental retardation to produce an expert opinion that the defendant possessed an IQ of 75 or below and that there is a reasonable basis to believe that further testing would show the defendant to be

mentally retarded. No such showing has been made in Mitchell's application for post-conviction relief. This issue is without merit.

*Mitchell*, 886 So. 2d at 712-13.

This Court has reviewed Mitchell's submissions on this issue and agrees with the Mississippi Supreme Court. *Atkins* left up to each state the responsibility of developing a procedure by which to determine which inmates satisfied the clinical definition of mental retardation.[9] That definition requires "not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Atkins*, 536 U.S. at 317-18. In response to *Atkins's* directive, the Mississippi Supreme Court set forth its guidelines for applying that case in *Chase v. State*, 873 So. 2d 1013, 1028-29 (Miss. 2004); *see also Doss v. State*, 19 So. 3d 690, 709 (Miss. 2009). Those guidelines require an offender to establish, by reference to an approved test, that he is mentally retarded, as defined above, and to provide some evidence that he is not malingering. *Lynch v. State*, 951 So. 2d 549, 556-57 (Miss. 2007). To be entitled to have such evidence considered, however, the offender must produce an affidavit from "a licensed psychologist or psychiatrist, qualified as an expert in the field of assessing mental retardation, and further qualified as an expert in the administration and interpretation of tests, and in the evaluation of persons, for purposes of determining mental

---

[9] In 2007, the American Association on Mental Retardation changed its name to the American Association on Intellectual and Developmental Disabilities, recognizing that the term "intellectual disability" is now preferred to "mental retardation." However, since this case pre-dates that change, this Court will use the term "mental retardation" for consistency and clarity.

retardation." *Chase*, 873 So. 2d at 1029. The affidavit must state that the expert opines,"to a reasonable degree of certainty, that (1) the defendant has a combined Intelligence Quotient ("IQ") of 75 or below, and; (2) in the opinion of the expert there is a reasonable basis to believe that, upon further testing, the defendant will be found to be mentally retarded . . . ." *Id.* In addition to believing that the offender is mentally retarded, the expert must also demonstrate, through administering the MMPI-II, that the offender is not malingering. *Id.* The last part of the *Chase* test was revisited in *Lynch*, where it was determined that other tests for malingering could be substituted for the MMPI-II. 951 So. 2d at 556-57. The expert's opinion must be in the form of an affidavit. *Chase*, 873 So. 2d at 1029.

The Mississippi Supreme Court found that Mitchell had not made the threshold showing that would entitle him to an evidentiary hearing on the issue of mental retardation. In his habeas petition, Mitchell has directed the Court to several exhibits that had been offered in state court, none of which contains the requisite information. Under Mississippi law, a failure to provide the requisite documentation for a claim of mental retardation will result in a rejection of the claim. *Branch v. State*, 961 So. 2d 659, 664-65 (Miss. 2007) (affidavit of mental health professional was stricken for lack of authentication and other evidence did not support claim); *Scott v. State*, 878 So. 2d 933, 948 (Miss. 2004) (holding that testimony of expert that appellant "functioned in the range of borderline retardation" did not satisfy the requirements of *Chase*). This Court is unaware of any clearly established federal law holding that Mississippi's procedural

requirements for establishing the entitlement to an evidentiary hearing on an *Atkins* claim are constitutionally infirm.

Here, Mitchell produced a variety of documents to show that he is mentally retarded, none of which complies with the procedural requirements set out in *Chase*. According to him, school records show that his IQ was tested at 71, 74, 76, and 65, "well within the mental retardation levels required by *Atkins*." Respondents argue that the records show no such thing, but are merely sub-test scores. This Court has reviewed those records, and they are inconclusive. On a page titled, "Standardized Tests – Grades 1-12," there is a section sub-titled, "Mental Abilities or Intelligence Tests (Indicate Whether Percentiles or Quotients Used)." It appears that some sort of mental ability testing was done in 1959, when Mitchell was nine years old. Under the Section "IQ" appears a score of 77. Another test was performed in 1963, and the categories named and the associated IQ scores follow: Verb.-71, Space-0, Reasoning-74, Number -0, Words -76, and S.A.-65. Absent some sort of explanation of these categories, an identification of one of these categories as a full scale IQ, and an explanation of the scores of 0 and their effect on the mean score, if there was a mean score, these numbers are practically meaningless. In any event, this document falls woefully short of the evidence required by the Mississippi Supreme Court under *Chase*.

In 1975, in connection with an evaluation of his ability to stand trial for the first murder charges, Mitchell was diagnosed with mild, or borderline, mental retardation by the staff of the Mississippi State Hospital. A more detailed explanation for this diagnosis appears in the report of Dr. Guild, which related the following:

On the Wechsler, Mr. Mitchell obtained a full scale I.Q. score of 79, representing borderline mental retardation. His verbal I.Q. score of 85 is classified as dull normal, while his non-verbal I.Q. score of 74 falls into the borderline mental retardation range of intelligence. The subtest scatter suggests that Mr. Mitchell has a fairly well-organized verbal defense system. Such people may be able to explain why one should behave in a socially appropriate way, but do not follow up their verbal understanding with the appropriate behavior. There is nothing in the Wechsler subtest pattern to suggest an organic problem.

Finally, a psychological evaluation performed at the Mississippi State Penitentiary in 1977 indicated that Mitchell's Full Scale IQ on the short-form WAIS was 83 (verbal IQ was 76; performance IQ was 94).

None of these documents satisfies the first requirement under *Chase*: an affidavit from a qualified professional indicating that Mitchell has a combined Intelligence Quotient ("IQ") of 75 or below and there is a reasonable basis to believe that, upon further testing, he would be found to be mentally retarded. In the absence of this evidence, Mitchell's arguments regarding his adaptive deficits need not be considered. Moreover, as discussed earlier, these arguments are not persuasive. For all of these reasons, this Court concludes that the opinion of the Mississippi Supreme Court finding that Mitchell had not established that he is mentally retarded is not contrary to, or an unreasonable application of, clearly established federal law. He cannot show that he is entitled to habeas relief on this issue.

I.     **The Petitioner was denied his fundamental Eighth and Fourteenth Amendment rights and due process of law, as well as the principles set out in *Beck v. Alabama*, as the trial jury was precluded from considering the lesser included offense of manslaughter, despite substantial proof that the murder was committed in the heat of passion, as defined by state law.**

This argument was made in state court purely on the basis of state law, and Respondents argue that it is, therefore, barred from review on federal grounds here. Mitchell has essentially conceded this issue in his Rebuttal Brief, but argues that, "based on the evidence, there is a clear showing of cause and prejudice on this claim." Having reviewed the claim and the applicable law, it is clear that Mitchell is foreclosed from relief on this issue.

In his initial brief on direct appeal, Mitchell made the following argument:

> Mitchell claims that the trial judge erred in refusing defense jury instruction no. D-13 (C.R. Vol IV, pp. 597-599). this defense jury instruction gave the jury the option of returning a verdict on the lesser included offense of manslaughter. The only defense theory that could have been argued to the jury was that the killing was done in the heat of passion thereby negating malice aforethought or deliberate design. The trial court's refusal to grant the defense this requested jury instruction left the defense without a theory to argue in closing before the jury. Generally, in homicide cases, the trial court should instruct the jury about defendant's theories of the defense, justification or excuse that are supported by the evidence, no matter how meager or unlikely, and the trial court's failure to do so is error requiring reversal. *See Manual v. State*, 667 So. 2d 590 (Miss. 1995); *Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

(Amend. Opening Br. for Appellant 40)

In his reply brief, Mitchell argued:

> In ***Welch v. State***, this Court noted:

> It was also error for the trial court not to allow Welch's instruction relating to his theory of defense. Defendants are entitled to have instructions on their theory of the case presented to the jury for which there is foundation in evidence, even thought the evidence might be weak, insufficient, inconsistent, or of doubtful credibility, and even though the sole testimony in support of the defense is the defendant's own testimony. ***U.S. v. Young***, 464 F.2d 160,

appeal after remand, 482 F.2d 993 (5th Cir. 1973); ***Gandy v. State***, 355 So. 2d 1096 (Miss. 1978).

566. So. 2d 680 (Miss. 1990).

> By the very nature of the killing of the decedent the jury could have reasonably concluded that Milliken's killing was manslaughter . . . . It would indeed seem highly probable that a reasonable person on a jury would conclude that the person responsible for Milliken's death did so in a "heat of passion." In the definition of "heat of passion" given at Appellee's Brief pg. 51, the condition of Milliken's body would almost be prima facie evidence that her killing was done in the heat of passion.

(Reply Br. for Appellant 24)

The Mississippi Supreme Court denied relief on this issue, solely on the basis of the state law's definition of manslaughter, then codified in Miss. Code Ann. § 97-03-5 (1972 & Supp. 1994) as, "the killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by use of a dangerous weapon, without authority of law, and not in necessary self-defense . . . ." Case law further described manslaughter as a homicide resulting from "passion or anger" or "an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror." *Mitchell*, 792 So. 2d at 218 (citing *Tait v. State*, 669 So. 2d 85, 89 (Miss. 1996)). The court held that the evidence presented in Mitchell's case precluded a manslaughter instruction, noting:

> The video published during the trial showed Mitchell explaining that Milliken had slapped him, and as a "reflex," he "hit her." This is the only evidence received by the jury that might have shown that heat of passion was an element of the crime. Nothing else presented to the jury would support a manslaughter instruction. Moreover, the slap and reflexive hit administered by Mitchell occurred in a mall parking lot, not where Milliken was subsequently killed. In an act of premeditation, Mitchell took Milliken to the area under the bridge, beat and strangled her, ran over her, and eventually killed her by crushing her skill with his vehicle.

*Id.* at 219.  Since no reasonable juror could conclude that Mitchell murdered Milliken "without malice," a manslaughter instruction was not required under state law.  *Id.*

In his post-conviction petition, Mitchell made this claim under state law, but also argued that the refusal of his manslaughter instruction violated the Sixth and Fourteenth Amendments to the United States Constitution, as interpreted by the Supreme Court in *Beck v. Alabama*, 447 U.S. 625, 644-46 (1980).  The state court held that the issue was barred from consideration as res judicata.  *Mitchell*, 886 So. 2d 713.  Additionally, the court repeated its earlier holding that the evidence did not merit such an instruction.

The Supreme Court has previously refused to consider a habeas claim that a petitioner should have been permitted to argue manslaughter in a death penalty case, because the petitioner had not argued federal case law in his state court appeal.  *Howell v. Mississippi*, 543 U.S. 440, 443 (2005) ("Petitioner's brief in the State Supreme Court did not properly present his claim as one arising under federal law. In the relevant argument, he did not cite the Constitution or even any cases directly construing it, much less any of this Court's cases." (footnote omitted))  *Howell* was a direct appeal, so the issue of whether the petitioner cured the defect by raising his claim in post-conviction proceedings, as Mitchell did here, did not arise.  However, the law is clear that a federal claim cannot be raised for the first time in post-conviction proceedings.  *Teague v. Lane*, 489 U.S. 288, 297-98 (1989); *Martin v. Maxey*, 98 F.3d 844, 848-49 (5th Cir. 1966).  It is equally clear that the state court, in its post-conviction opinion, did not consider the federal claim on its merits, but held it barred on grounds of res judicata.

The Supreme Court's decision in *Howell* forecloses this Court's consideration of Mitchell's lesser included offense claim. Although his Rebuttal Brief states that "there is clear showing of cause and prejudice on this claim," thereby excusing his failure to exhaust this issue, there is no explanation of what the "cause and prejudice" could be. In any event, it is not clear that *Beck* would apply where the jury could choose between a death sentence and life without parole. In *Beck*, the Supreme Court considered a capital case under Alabama law, where the court could not give a lesser included offense instruction and the jury could only consider conviction – and a mandatory death penalty – or acquittal. Thus, "if the jury believed that the defendant had committed some other serious offense, it might convict him of the capital crime rather than acquit him altogether." *Hopkins v. Reeves*, 524 U.S. 88, 95 (1998) (citing *Beck*, 447 U.S. at 642-43) (holding that *Beck* did not apply to a capital case where the jury did not sentence and the sentencing panel had the choice of life imprisonment). In a capital case under the Alabama scheme, the Court held, the jury's lack of choice as to sentencing creates "a significant possibility that the death penalty would be imposed upon defendants whose conduct did not merit it, simply because their juries might be convinced that they had committed some serious crime and should not escape punishment entirely." *Hopkins*, 524 U.S. at 98. In *Hopkins*, that situation did not exist, and the trial court was not constitutionally required to give the lesser included offense instruction.

In another capital case, the petitioner argued that *Beck* required that his jury be instructed on any lesser included non-capital offense supported by the evidence. *Schad v. Arizona*, 501 U.S. 624, 646 (1991). The Court disagreed, explaining:

> Petitioner misapprehends the conceptual underpinnings of *Beck*. Our fundamental concern in *Beck* was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all.

*Id*. Later, in *Howell*, the Court recognized that the Mississippi Supreme Court interpreted *Beck* as "inapplicable where the jury has the additional option of life imprisonment . . . a conclusion that finds some support in our cases . . . ." 543 U.S. at 443 (Citing *Hopkins* and *Schad*).

This Court concludes that Mitchell's claim that a lesser included offense should have been presented as an option in his case is procedurally barred as a federal claim, since it was not raised on direct appeal. In any event, clearly established federal law indicates that such an instruction would not be required in his case, since the jury had the option of sentencing him to life without parole. For these reasons, habeas relief is not merited on this issue.

**J.    The trial court erred in not granting Petitioner's motion to dismiss for failure to provide a speedy trial pursuant to and guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.**

Mitchell claims here that the period between his arrest on November 22, 1995, and his trial on July 20, 1998, was excessively long and in violation of his right to a speedy trial, which is guaranteed by the Sixth and Fourteenth Amendments. He further claims that the delay satisfies each of the four factors identified by the Supreme Court as abrogating the constitutional guarantee. *Barker v. Wingo*, 407 U.S. 514, 530-36

(1972).  Because his rights were violated, Mitchell contends, the charges against him should be dismissed.

In response, the State argues that Mitchell waived his right to a speedy trial by requesting several continuances.  Respondents further argue that Mitchell has not shown any prejudice resulting from the delay, other than a vague assumption that witnesses' memories would have faded during that time.  Finally, Respondents point out that Mitchell would have been incarcerated during that period in any event, since he was jailed not only for murder, but for parole violation.

These arguments were raised to the Mississippi Supreme Court on direct appeal.  In the portion of its opinion discussing this issue, that court set out the convoluted history of the pretrial proceedings in this case.  Since the parties apparently agree that this recitation of facts is accurate, and since these facts are fully set out in that court's opinion and are crucial to this Court's consideration of the issue, they are set out in full below:  (The layout has been slightly altered for clarity.)

| | |
|---|---|
| November 22, 1995 | Mitchell arrested for traffic violations, and subsequently arrested for Milliken's murder. Mitchell makes his initial appearance on the capital murder charge.  Warrant is issued for Mitchell's arrest for parole violations (illegal use of drugs or alcohol). |
| April 16, 1996 | Mitchell files demand for speedy trial through attorney Keith Roberts. |
| July 25, 1996 | Mitchell is indicted on his first indictment. |
| August 5, 1996 | Mitchell files pro se demand for a speedy trial. |

| | |
|---|---|
| October 1, 1996 | Mitchell files pro se motion to dismiss charge for lack of speedy trial. |
| October 10, 1996 | Mitchell arraigned on first indictment. Addressing the speedy trial request, the trial judge offers to "put the jury in the box tomorrow or next week," Mitchell declines, explaining that he and the State agree on trial date for February 10, 1997. |
| January 21, 1997 | Mitchell files for continuance for trial set for February 10, 1997. |
| January 31, 1997 | Correction made on date originally set for trial (February 3rd instead of 10th); motion for continuance made by defense is discussed. Defense counsel mentions reasons for making continuance motion including the need for access to physical evidence related to Mitchell's vehicle and lab samples, and the need to view evidence in order to get expert testimony prepared. Prosecutor notes that defense has not requested any physical evidence go to a laboratory or expert. Trial judge continued the case until a scheduling order could be set and sets February 14, 1997 as the date of the status conference to determine the scheduling order. The trial judge remarked that the continuance would run against Mitchell for the purpose of speedy trial determinations and mentioned again that if Mitchell wanted "a speedy trial, we can put the jury in the box." The resulting scheduling order included Mitchell's waiver of all speedy trial rights. |
| October 21, 1997 | Status conference held where the State announced it would be prepared to go forward with trial on November 3, 1997 but was undecided on the issue if the trial judge granted defense's motion to suppress the confession. Defense mentioned they were prepared either way. Roberts, Mitchell's attorney, explains that he feels the speedy trial issue is frivolous due to |

Mitchell having his parole revoked and that he has not continued to pursue the speedy trial issue because he and Mitchell disagree on if there is a violation.

October 28, 1997     Hearing occurs regarding defense counsel's motion to withdraw. Mitchell states that he "acted a little bit hasty" and withdraws his request to fire his attorney. Defense counsel not prepared to argue pretrial motions due to the pre-existing conflict with Mitchell. Defense counsel moves ore tenus to expand time to file motions, and to schedule suppression hearing for November 6, 1997. Defense counsel asks for trial in January or February (trial had been scheduled for November 3, 1997). Defense counsel and Mitchell waive all speedy trial rights associated with motion for continuance and modification of scheduling order.

November 3, 1997     Mitchell's motion for a continuance granted. The trial is rescheduled for March 30, 1998.

January 17, 1998     Trial judge grants Mitchell's motion to substitute Pisarich for Roberts as attorney of record.

February 5, 1998     Mitchell, by and through his new attorney, files several motions, including a motion to re-open the court's hearings on the previous motions for a speedy trial.

February 6, 1998     Motion hearing held. Mitchell is represented by Pisarich and Musselman (as opposed to previous representations of Roberts and Musselman). Pisarich had filed several motions the day before and agreed to continue the motions. Mitchell consents to the continuance.

March 24, 1998     Mitchell, through his attorneys, files motion for continuance and waives his speedy trial rights for the time period from when the trial had been

91

|  | set, March 30, 1998, until the time of the new trial. The trial is set for July 20, 1998. |
|---|---|
| April 3, 1998 | Motion hearing is held on the motion to suppress. |
| April 29, 1998 | Mitchell is indicted on his second indictment to correct a scrivener's error that occurred on the original indictment. |
| June 3, 1998 | Mitchell, through his attorneys, files another motion to re-open the court's hearing on the previous motions for a speedy trial. |
| June 4, 1998 | A hearing is held. Mitchell is arraigned on the second indictment. Mitchell pleads not guilty. Defense counsel concedes that the speedy trial issue has never been fully presented to the trial court. The trial judge, at defense counsel's request, reserved ruling on the motion for a speedy trial for the next hearing date. |
| June 8, 1998 | Mitchell, through his attorneys, files "motion to dismiss based on violations of defendant's rights to a speedy trial" and a request for an evidentiary hearing. |
| July 15, 1998 | Mitchell, through his attorneys, moved for a continuance based upon his demand for special venire. |
| July 17, 1998 | A hearing is held. The trial judge comments that this is the first time that the issue of a speedy trial has been presented for consideration by stating: |

But isn't it kind of ironic that the first time that it's brought up is less than 72 hours before the trial that is to be had on Monday? I can't give you any speedier trial. If you demand for a speedy trial and I want to give you a speedy trial, I can't give you one any quicker than three days; do you understand that?

> Prolonged discussion of the speedy trial issue occurs, including testimony from Mitchell on the matter. The trial court overrules the motion for a speedy trial and states the following:

> And when they make a demand for a speedy trial, and if it would have been brought to my attention and they asked for a speedy trial, you know, we would have given him one in three weeks after he asked for it if the parties would have been ready. But I think all of us know in a capital death case that it takes a little bit more studied effort on the part of all parties to get the matter ripe for trial. The second part is that if my family and I, and I've never done it, made a reservation to go to Disney World and for whatever reason we decided that we couldn't make it and we canceled it, it would be at least a year, I understand, before the space at Disney World would be available for our family to get there.

> When we have a case set for trial and we take it off the trial docket, you know, I've tried Richard Gerald Jordan, I think other capital murder trials, and because of the size of this docket it is just extremely difficult to have a judge and a contract defender or public defender and prosecutor doing nothing but waiting to go to trial on these death cases. I have reviewed in my mind all that I can recollect concerning the hearings that we have had. Of course the record would be specific on it. But under the totality of the circumstances of the evidence that's before the Court, both presented here today as well as what's been presented in the other hearings, I'm going to find that the motion is not well taken. I'll deny the motion for a speedy trial.

792 So. 2d at 208-10.

In its opinion on Mitchell's direct appeal, the Mississippi Supreme Court initially noted that state law provided that criminal trials must begin within 270 days after arraignment. Miss. Code Ann. § 99-17-1 (1972 & Supp. 2000). Analyzing the speedy trial claim under state law, the court held that the calculation started over in Mitchell's case when he was indicted for the second time. *Id*. at 210-11. Based on this calculation, Mitchell was tried within forty-six days after his arraignment on the second indictment, and Mississippi law was not violated.

Turning to federal law, the court reviewed Mitchell's claim under *Barker v. Wingo*, recognizing the four factors established by that decision as determinative of a speedy trial claim: "(1) length of the delay, (2) reason for the delay, (3) defendant's assertion of his right, and (4) prejudice to the defendant."  792 So. 2d at 211 (quoting the *Barker* test from *Wall v. State*, 718 So. 2d 1107, 1113 (Miss. 1998)).  As the court further recognized, there is no mechanical formula for this analysis, nor is any one factor dispositive.  792 So. 2d at 211.  Instead, the four factors are analyzed by reference to the peculiar facts of the case, and they are each weighed and balanced to decide whether a constitutional violation has occurred.  *Id.*

With regard to the first factor, the state court found that 970 days had elapsed between Mitchell's arrest and trial.  Considering the reason for the delay, the court found that Mitchell's claim that delay was caused by the prosecution's failure to provide timely discovery material was not supported by specific examples.  *Id.* at 211.  The court further found that Mitchell had requested numerous continuances, and, in almost all of these requests, he waived his right to a speedy trial.  *Id.* at 212.  For these reasons, the court found that Mitchell was responsible for the delay.

The third *Barker* factor is whether the defendant asserted his right to a speedy trial, and the Mississippi Supreme Court found that Mitchell filed three such motions – one through his first attorney, Keith Roberts, on April 16, 1996; a pro se motion on August 15, 1996; and another pro se motion on October 1, 1996.  Although these motions were filed, they were not raised to the trial court until the Friday before his trial actually began.  Additionally, after the early filings, there were requests for continuances that

waived the right to a speedy trial. The state court found, therefore, that Mitchell had not asserted his right to a speedy trial in a timely fashion. *Id*. at 212.

Finally, the court considered whether Mitchell was prejudiced by the delay. Finding that Mitchell had not specified how he was prejudiced, the court noted that he would have been incarcerated during that period in any event, as he had violated the terms of his parole. *Id*. at 213. Mitchell had also complained that the trial judge's ruling on this issue was inadequate, as he did not make specific findings on the record. The appellate court disagreed, holding, "Although it may be preferred that a trial judge be more specific in his or her findings regarding the *Barker* factors, the trial judge's failure to specifically enunciate those findings does not rise to the level of 'manifest wrong' that is needed to warrant a reversal." *Id*. Having reviewed Mitchell's case under all four of the *Barker* factors, the court found that Mitchell's right to a speedy trial was not violated. *Id*. The issue was raised again in Mitchell's petition for post-conviction relief, but held to be procedurally barred. *Mitchell*, 886 So. 2d at 713-14.

In his argument to this Court, Mitchell has ignored the standard of review for a habeas case, and, rather than demonstrate that the state court's decision unreasonably applied federal law, argues the speedy trial issue as if it could be reviewed by this Court de novo. In fact, Mitchell does not even mention the Mississippi Supreme Court's decision in his argument, although it is that decision, not Mitchell's interpretation of *Barker*, that is the focus of a habeas inquiry. 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 399 (2000) (holding that § 2254(d)(1) "prohibits a federal court from granting an application for a writ of habeas corpus with respect to a claim adjudicated

on the merits in state court unless that adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" (quoting statute)).

As Justice O'Connor recognized in *Williams*, the law prior to the passage of the AEDPA permitted reviewing courts to grant habeas relief if, in their independent judgment, a constitutional violation had occurred. *Id.* at 402. After 1996, however, the standard changed, and the state court's opinion, even on federal constitutional issues, is entitled to deference. So long as the state court recognizes the applicable federal law and applies it in a manner that is not unreasonable or contrary to Supreme Court precedent, habeas relief is unavailable, even if the reviewing court concludes that the state court's application of federal law is incorrect. *Id.* at 406-07, 411, The state court's factual findings are entitled to even greater deference. Mitchell's failure to show that the opinion of the Mississippi Supreme Court was an unreasonable application of, or contrary to, clearly established federal law is fatal to his position. Even a de novo review, however, would result in a determination that he is entitled to no relief on this issue.

Here, there is no disagreement among the parties as to the time that elapsed between Mitchell's arrest and his trial. Mitchell argues here, as he argued to the state court, that the State was responsible for the delay because it failed to provide him with discovery materials. The Mississippi Supreme Court rejected that argument, finding that Mitchell had failed to establish that claim by specific evidence. Mitchell's brief to that court stated only, "There is no doubt the prosecution was tardy on a number of

occasions in delivering discovery material to the defense. At least one of the defense's motions is predicated on the failure of the prosecution to provide timely discovery material." (Amend. Br. for Appellant 32) In his Reply Brief, Mitchell is a little more specific:

> As late as October 28, 1997, the State was still delivering a video tape to the defense. (T. Vol. I, pg. 79-83). This would have been over one (1) year since Mitchell's arraignment on October 10, 1996. The trial judge wanted to put the jury in the box on the following day or week after October 10, 1996, but the prosecution was waiting [sic] the end of 1997 to finalize the delivery of discovery materials."

(Reply Br. 15)

The record shows that on April 3, 1996, Mitchell filed Motion for Partial Discovery and Order to Preserve Samples. In that Motion, Mitchell asked that any samples taken from his car or at the crime scene be preserved and that he be provided with a copy of the autopsy report. Specifically, he asked the court for "a full copy of the complete Autopsy report and all information regarding samples taken from the crime scene and/or submitted to the Crime Laboratory for testing be furnished to the Defense. Further, the Defendant prays that the State be ordered to preserve sufficient samples for independent testing." That motion was apparently granted by the trial judge.

Mitchell refers to pages 80-81 of the transcript to support his claim that, during a pretrial hearing on January 31, 1997, it became obvious that the State had withheld discovery material from him. However, at his arraignment on October 10, 1996, Mitchell's attorney admitted that the parties "had an early disclosure on some aspect of this case, and this case has already begun some of the background investigation." At

that time, counsel discussed with the court a trial setting in February, 1997, and there was no indication that the defense had encountered any difficulty in obtaining information from the State. During the January, 1997, hearing, counsel argued to the trial court that Mitchell's trial should be continued because they had received neither copies of lab work or samples for independent testing. The prosecutor informed the court that no testing had been requested, except of the tires on Mitchell's car. He indicated that the State did not intend to conduct any further testing, and he noted that Mitchell had not requested that it be done. Later during that hearing, defense counsel agreed with the prosecutor's position, stating, "I will not fault [the prosecutor] for this."

At a hearing on October 21, 1997, the prosecutor announced to the court that defense counsel had asserted that he had not received all of the discovery to which he was entitled, so additional material, in the form of lab reports, had been sent to him. Defense counsel concurred in that report, stating, "Now it turns out that when we got that information I'm not too concerned about it. I don't see any real delay problems because the information that I read in that, with the exception of a single sample, the results were similar but inconclusive or not at all the same of each of the sample items taken." Also at that hearing, the prosecution announced that it had given the videotaped confession to defense counsel to watch and return. Mitchell was offered an opportunity to view the tape at that time, but he declined. A week later, on October 28, 1997, the subject of the videotape came up again, and the prosecutor announced that he had delivered a copy of it to defense counsel, which was confirmed. This is the part of the record to which Mitchell has referred in his brief to this Court.

The Mississippi Supreme Court recognized all of these facts in its opinion, stating:

> Mitchell's need for continuances included: the need to access materials to physical evidence related to Mitchell's vehicle and lab samples in order to prepare expert testimony (Mitchell had not requested any physical evidence to go to a laboratory or expert); Mitchell's counsel was unprepared to go forward with defense's motions because he (Roberts) was making a motion to withdraw as counsel when a reconciliation between Mitchell and his counsel occurred; and, because Mitchell's new counsel (Pisarich) needed additional time to prepare his motions and review discovery in the case.

*Mitchell*, 792 So. 2d at 212. The standard of review for the state court's factual findings requires this court to defer to them unless they were unreasonable based on the evidence in the record. Based on the record, this Court cannot say that the state court's findings were unreasonable. The state court held that Mitchell had not shown that the State withheld discovery materials and that the delay was attributable to Mitchell, rather than the State. This Court cannot say that this finding was an unreasonable interpretation of the evidence or that the court's conclusion was an unreasonable application of, or contrary to, clearly established federal law. The Supreme Court spoke on this issue in *Barker*, saying, "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government." 407 U.S. at 531. There is no indication that the State was resisting Mitchell's discovery efforts on the samples; there was simply confusion about what had been requested. There is likewise no indication that the State was intentionally withholding the videotaped confession. Moreover, whenever the defense brought a discovery problem to the trial court's attention, it was quickly resolved.

*Barker* went further, however, and held, "A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Id.* Here, there is a suggestion in the record that some of the delay was caused by the trial court's docket; however, this Court cannot fault the state appellate court's conclusions that most of the delay was caused by Mitchell's attorneys, who needed additional time to prepare his case for trial. The Supreme Court has held that delay caused by defense counsel's failure to advance the case on the docket should be changed against the defendant. *Vermont v. Brillon*, ____ U.S. ____, 129 S. Ct. 1283, 1290-91 (2009). This is so even if the attorney was appointed by the court. *Id.* at 1291. Charging the delay to the defendant is particularly appropriate when defense counsel's failure to move the case can be attributed to his difficult relationship with his client. *Id.* at 1292. Part of the problem in this case was the change in defense counsel prompted by Mitchell's difficulties with Roberts. For all of these reasons, the Court finds that the Mississippi Supreme Court's opinion on the cause for the delay in Mitchell's trial cannot be the basis for habeas relief.

With regard to Mitchell's assertion of his speedy trial right, the Mississippi Supreme Court recognized that both Mitchell and his attorney had filed demands for a speedy trial and that Mitchell moved, pro se, that his case be dismissed on that basis. *Mitchell*, 792 So. 2d at 212. At his arraignment, however, Mitchell agreed to the trial date proposed by the State. The record shows several more requests for continuances and specific waivers of the right to a speedy trial until June 3, 1998, when the issue was

again brought before the trial court by Mitchell's new attorney.  During a preliminary hearing on July 17, Mitchell testified about his requests for a speedy trial.  He admitted to appearing before and speaking to the trial judge on numerous occasions, and the prosecutor asked, "At no time, sir, during those direct conversations or dialogue between yourself and Judge Vlahos, and of course a transcript will reflect it, at no time did you demand a trial any speedier than what is reflected in the orders of the court?"  Mitchell answered, "No."

The Mississippi Supreme Court noted that Mitchell had filed his motions, but did not raise them to the trial court.  Under Rule 2.04 of the Uniform Rules of Circuit and County Court Practice, the burden is on the movant to obtain a ruling on a pretrial motion, and failure to do so constitutes a procedural bar. [10]  *See Chamberlin v. State*, 989 So. 2d 320, 343 (Miss. 2008); *Berry v. State,* 728 So.2d 568, 570 (Miss.1999) ("It is the responsibility of the movant to obtain a ruling from the court on motions filed by him and failure to do so constitutes a waiver of same.); *Holly v. State,* 671 So.2d 32, 37 (Miss.1996) (finding that the burden to obtain a ruling on an in limine motion to exclude evidence rests on the moving party); *Martin v. State*, 354 So.2d 1114, 1119 (Miss.1978) (same).

---

[10] "It is the duty of the movant, when a motion ... is filed ... to pursue said motion to hearing and decision by the court. Failure to pursue a pretrial motion to hearing and decision before trial is deemed an abandonment of that motion; however, said motion may be heard after the commencement of trial in the discretion of the court." U.R.C.C.C. 2.04.

Additionally, the court found that the early requests for a speedy trial were followed by either a request for or an acquiescence to a trial continuance. Finally, the court found that the last request for a speedy trial, which was brought before the court the Friday before the trial began, was not timely. This Court cannot say that any of these findings was unreasonable, based on the evidence, and the state court's application of the *Barker* principles to these findings was in accord with federal law.

Ultimately, the Mississippi Supreme Court found that Mitchell had not established any of the grounds recognized in *Barker* – oppressive pretrial incarceration, anxiety and concern, and impairment of the defense – that would show prejudice from the delay. *Mitchell*, 792 So. 2d at 212. Impairment of an accused's defense is the most important of these considerations. *Barker*, 407 U.S. at 532. In the most extreme case, a defense witness dies or is otherwise made unavailable. *Arrant v. Wainwright*, 468 F.2d 677, 682-84 (5th Cir. 1972). Mitchell has failed to prove that any exculpatory evidence was lost by the delay, stating only that "[i]t can logically be concluded" that witnesses' memories could fade over the time that elapsed between his arrest and trial. Such an allegation is insufficient to establish a *Barker* violation. *United States v. Frye*, 489 F.3d 201, 213 (5th Cir. 2007). The Mississippi Supreme Court found that Mitchell's incarceration was the result of his parole violation, as well as the murder charge. *Mitchell*, 792 So. 2d at 212-13. The Fifth Circuit has refused to find prejudice where a prisoner awaiting trial was also in custody for parole violations. *Cowart v. Hargett*, 16 F.3d 642, 647 (5th Cir. 1994) ("Incarceration on other charges or convictions pending

trial also does not constitute prejudice for *Barker* purposes."). This Court likewise finds no prejudice resulted from the delay in bringing Mitchell's case to trial.

It took an unusually long period of time – 970 days – to bring Mitchell to trial. However, Mitchell was responsible for much of the delay by requesting numerous continuances and waiving his speedy trial rights. There was no showing that the continuances were required because of any misconduct by the State. Furthermore, Mitchell did not timely assert his speedy trial right. Mitchell admitted that he made numerous appearances before the trial judge and never asked that his motion be heard until just before his trial actually commenced. Finally, there was no specific showing that Mitchell was prejudiced by the delay.

The test for a speedy trial violation that was established by *Barker* is a clearly established, but discretionary, rule. *Davis v. Kelly*, 316 F.3d 125, 128 (2d Cir. 2003). Deference is particularly accorded to the state court in such a matter, because balancing the *Barker* factors "'is more judicial art than science.'" *Rashad v. Walsh*, 300 F.3d 27, 45 (1st Cir. 2002) (quoting *Look v. Amaral*, 725 F.2d 4, 8 (1st Cir. 1984)). In the absence of a "bright line" rule to determine when the right to a speedy trial has been unconstitutionally abrogated, one court has determined that a state court's decision may satisfy habeas review by "simply identifying the *Barker* factors and analyzing them based on nonerroneous facts . . . ." *LaVoy v. Snedeker*, No. CIV 03-765, 2004 WL 3778602 at *17 (D.N.M. 2004). This Court finds that the Mississippi Supreme Court's opinion on this issue was a reasonable application of federal law to non-erroneous facts, and Mitchell is not entitled to habeas relief on this issue.

**K.    The Petitioner was denied his rights guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the Federal Constitution due to the cumulative effect of the errors at his capital trial.**

Mitchell raised this issue in his post-conviction petition, and the Mississippi Supreme Court rejected it, stating that, "[W]here 'there was no reversible error in any part . . . there is no reversible error to the whole.'" *Mitchell*, 886 So. 2d at 714 (quoting *McFee v. State*, 511 So. 2d 130, 136 (Miss. 1987)).  Moreover, the court held, Mitchell was not entitled to a perfect trial, but only a fair one, which he received.  Mitchell cannot show that this decision was contrary to, or an unreasonable application of, clearly established federal law.  There is no Supreme Court case on this issue, although the Court has been called upon in other cases to set a standard for cumulative error review. The Fifth Circuit in *Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992) (en banc), *cert. denied,* 508 U.S. 960 (1993), adopted a rigorous standard for cumulative error analysis:

> [W]e now hold that federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors "so infected the entire trial that the resulting conviction violates due process."

978 F.2d at 1456 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  *Derden* continues to be followed in the Fifth Circuit.  *See, e.g., Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007). (Repeating the language from *Derden* quoted above and stating, "As is apparent from this standard and as this court has stated explicitly, where individual allegations of error are not of constitutional stature or are not errors, there is 'nothing to cumulate.'").  Applied to Mitchell's case, this standard compels a conclusion

104

that Mitchell demonstrated no error that is worthy of cumulation; therefore, he is not entitled to habeas relief on this issue.

## CONCLUSION

Having reviewed each of Mitchell's claims for habeas corpus relief under the deferential standard of review required by 28 U.S.C. §2254(d), it appears that none possesses sufficient merit to warrant issuance of the writ. The Court finds no part of the Mississippi Supreme Court's opinions to be contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented, sufficient to justify habeas corpus relief. It is the opinion of the Court that William Mitchell is not entitled to habeas corpus relief under 28 U.S.C. § 2254.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that William Mitchell's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 is hereby **DENIED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that this action is hereby **dismissed with prejudice**. A separate final judgment dismissing this action with prejudice shall be entered in accordance with FED. R. CIV. P. 58.

**SO ORDERED AND ADJUDGED** this the 19th day of March, 2010.


*Louis Guirola, Jr.*
Louis Guirola, Jr.
United States District Judge